**In the Interest of C.L.C. and C.R.D., Minor Children.**

No. 12-02-00348-CV.

Court of Appeals of Texas, Tyler.

Aug. 27, 2003.

Douglas Scott Williams, Murchison, for appellant.

Donna R. Bennett, Dist. Atty's Office, Henderson County, Athens, for appellee.

Lee Ann Millender, for real party in interest.

Panel consisted of WORTHEN, C.J., GRIFFITH, J. and DeVASTO, J.

### OPINION

JAMES T. WORTHEN, Chief Justice.

Jimmy Crawford ("Crawford") appeals the termination of his parental rights.

Crawford presents three issues on appeal. We affirm.

## BACKGROUND

Crawford and Melanie Dawn Dickinson ("Dickinson") are the parents of two boys, C.L.C. and C.R.D. On the morning of October 9, 2001, John Floyd ("Floyd"), Precinct Four Constable in Henderson County, Texas, received a call regarding C.L.C. The child was sick, but the school had no contact information for the parents. The school requested that Floyd go to C.L.C.'s house and ask his parents to pick up the child. Floyd arrived at Crawford's residence about 8:40 a.m. He observed that the yard was a "mess" with garbage bags torn open in the yard, a mattress standing up against the side of the family's mobile home, abandoned vehicles, and a pickup with burned trash in it along with metal and glass garbage that would not burn. When Floyd left his vehicle, he noticed the television was extremely loud. After knocking and beating on the door produced no response, Floyd discovered the door was unlocked. As he opened the door, Floyd immediately noticed a chemical smell. Inside, there was something like a haze, and Floyd was concerned that it was a health hazard to enter the house.

Floyd found Crawford lying on a couch right inside the door with a spray can containing carburetor cleaner under his arm. Floyd identified the smell as carburetor cleaner fumes. Crawford was unresponsive until Floyd shook him and yelled at him. When Floyd explained to Crawford the purpose of his visit, Crawford stated that he knew C.L.C. was sick and that they had all been sick. Floyd told Crawford that someone needed to pick up the child. Crawford told Floyd to "go tell her to go get him," pointing to the opposite end of the trailer. Floyd believed Crawford was referring to Dickinson, but he refused Crawford's request because the house was in such a mess that Floyd did not want to walk through it. Floyd asked Crawford to get Dickinson. After calling Dickinson's name and receiving no response, Crawford agreed to pick up C.L.C. from school. Although he did not conduct a field sobriety test, Floyd assessed Crawford and determined that he was capable of driving. Crawford went to the school and picked up C.L.C. Floyd followed him and stated that Crawford's driving was "okay."

After Crawford left the school, Floyd met with C.L.C.'s teacher and the school nurse. Together, they concluded that Child Protective Services should be contacted regarding C.L.C.'s home situation. An investigator for the Texas Department of Protective and Regulatory Services (the "Department"), Katherine Diesch ("Diesch"), received the report alleging inhalant abuse in C.L.C.'s family, abuse of drugs including methamphetamines and alcohol, incidents of violence, and a dirty home. Based on the report, Diesch accompanied Floyd and Eric Ward ("Ward"), a Henderson County Health and Sanitation Officer, to Crawford's home. When they arrived at the home, Crawford was sitting on the tailgate of his pickup truck in the yard. According to Floyd, Crawford did not appear to be intoxicated or a danger to himself or others. Floyd located C.L.C. in the living room of the residence watching television, but no one else was in the house. However, the carburetor cleaner spray can was sitting on the floor by the couch within access of the child.

Floyd observed that the house was worse than he realized that morning. Paper plates with half-eaten food were in the living room, the sink was full of dishes and "nasty" water, and so many paper plates and dishes were stacked on the stove that

Floyd was unable to determine if the stove was electric or gas. In Floyd's opinion, the house was very unsanitary and unsafe for small children. Ward issued Crawford a warning citation for conditions outside the house.

Diesch stated that the yard was an "absolute mess" and loud music emanated from the property. She confirmed Floyd's description of the premises and did not believe the yard was in any condition for young children to play in. She approached Crawford, but he immediately became "out of control," questioning her purpose there. Diesch was unable to conduct an interview. Moreover, Diesch stated that Crawford came toward her in such a way that she was afraid of him, and felt he was attempting to intimidate and threaten her. Diesch stated that Crawford was unclean and smelled of urine. Crawford did not allow Diesch to go in the house or take photographs.

Later, Shirley McCarty ("McCarty"), Dickinson's aunt, arrived in a car with Dickinson and C.R.D. Diesch stated that Dickinson was "totally insensible" and passed out in the back seat of the vehicle. When Dickinson woke up, she was incoherent and unable to carry on a conversation. The situation became chaotic because Crawford and Dickinson began arguing, screaming, and yelling at one another. At that point, Diesch agreed to meet McCarty, Dickinson, and the two children at her office. At Diesch's office, Dickinson was still incomprehensible. Diesch attempted to implement a safety plan in which Dickinson would leave Crawford and unsupervised visitation between the children and Crawford would be prohibited. However, Dickinson would not agree to leave.

McCarty took the children to her home while Dickinson left the office.

The following morning, McCarty called Diesch, sounding "frantic and upset." McCarty had just received a call from Dickinson who stated that she and Crawford were coming to get the children. McCarty was afraid of Crawford and agreed to take the children to Diesch's office. That day, October 10, 2001, the children were taken into the Department's custody and placed in a foster home because Diesch did not believe the children were safe with their parents. Later the same day, Crawford and Dickinson went to the Department's office. Diesch was in her office after hours and heard a commotion. As she looked out her office door, she saw Dickinson's face in the window of the security door and concluded that someone else was there as well. Dickinson stated that she needed to talk and denied that Crawford was with her. Then, Diesch heard the other security door being pulled out of the wall, frame and all, and saw Crawford running past her window. Crawford was arrested for retaliation later that night.

On October 11, 2001, the Department filed a petition for protection of a child, for conservatorship, and for termination of Crawford and Dickinson's parental rights. An affidavit by Diesch attached to the petition contained details of the Department's history with the family. Additionally, the affidavit included allegations of drug and alcohol abuse by both parents, possible "sniffing" by Crawford from a spray can of carburetor cleaner, the mental illness of Dickinson, unsanitary home conditions, incidents of domestic violence between the parents, and retaliation against a Department worker.[1] On Octo-

---

1. The record contains a catalog of incidents of alleged domestic violence that, for the most part, are denied by both Crawford and Dick-inson. For the sake of brevity, we recite a reduced number of the allegations of domestic violence.

ber 1 and 2, 2002, the termination proceeding was tried before the court.

On November 4, 2002, the trial court found, by clear and convincing evidence, that Crawford knowingly placed or knowingly allowed his children to remain in conditions or surroundings which endangered their physical or emotional well-being, and engaged in conduct or knowingly placed his children with persons who engaged in conduct which endangered their physical or emotional well-being. Further, the trial court found that termination was in the best interests of the children.[2] This appeal followed.

### TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex.App.-Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex.2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex.App.-Texarkana 1995, writ denied). A termination decree is "complete, final, irrevocable [and] divests for all time the parent and child of all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex.1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex.App.-El Paso 1998, no pet.) Thus, breaking the bonds between a parent and child "can never be justified without the most solid and substantial reasons." *Wiley*, 543 S.W.2d at 352. Because a termination action permanently sunders those bonds, the proceedings must be strictly scrutinized. *Id.; In re Shaw*, 966 S.W.2d at 179. However, parental rights are not absolute, and it is vital that the emotional and physical interests of the child not be sacrificed at the expense of preserving that right. *In re C.H.*, 89 S.W.3d 17, 26 (Tex.2002).

Section 161.001 of the Family Code permits a court to order termination of parental rights if two elements are established. TEX. FAM.CODE ANN. § 161.001 (Vernon 2002); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex.App.-Waco 1999, no pet.), *disapproved on other grounds*, 96 S.W.3d 256, 267 & n. 39 (Tex.2002). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. TEX. FAM.CODE ANN. § 161.001(1) (Vernon 2002); *Green v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex.App.-El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM.CODE ANN. § 161.001(2) (Vernon 2002); *In re J.M.T.*, 39 S.W.3d at 237. Additionally, both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM.CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

Due process requires a petitioner to justify termination by clear and convincing evidence because termination is such a drastic remedy. *In re J.M.T.*, 39 S.W.3d at 237. The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM.CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (Vernon 2002). There is a strong presumption that the best interest of the child is served by preserving the parent-child relationship. *Wiley*, 543

---

**2.** The court also terminated Dickinson's pa- rental rights. She does not appeal.

S.W.2d at 352; *In re J.M.T.*, 39 S.W.3d at 240. Thus, the burden of proof is on the person seeking to deprive the parent of their parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

### STANDARD OF REVIEW

When confronted by both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex.App.-Amarillo 1999, no pet.). Because termination findings must be based on clear and convincing evidence, the standard of review is not the same on appeal as a finding based upon a preponderance of the evidence. *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex.2002). Therefore, in reviewing the legal sufficiency of the evidence to support termination findings, an appellate court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.* at 266. In order that proper deference is shown to the fact finder's role, an appellate court must presume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id.* However, a reviewing court is not required to ignore all evidence not supporting the finding because that might bias a clear and convincing analysis. *Id.* A judgment in favor of the parent is generally required if there is legally insufficient evidence. *Id.*

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d at 25. In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id.* at 27–29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. If the disputed evidence is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* An appellate court should specify its reasons for concluding that a reasonable trier of fact could not have attributed disputed evidence in favor of the finding. *Id.* at 266–67.

This standard retains the deference an appellate court must have for the fact finder's role. *In re C.H.*, 89 S.W.3d at 26. Additionally, the trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex.App.-Houston [1st Dist.] 1997, pet. denied). Thus, our review must not be so rigorous that only fact findings established beyond a reasonable doubt could withstand review. *In re C.H.*, 89 S.W.3d at 26. Further, a trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards applied in reviewing evidence supporting a jury's finding. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994); *In re V.R.W.*, 41 S.W.3d 183, 190 (Tex.App.-Houston [14th Dist.] 2001, no pet.), *disapproved on other grounds*, 96 S.W.3d 256, 267 & n. 39 (Tex. 2002).

*TERMINATION UNDER SECTION 161.001(1)(D)*

Crawford contends that the evidence is legally and factually insufficient to support a finding that he knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being. Crawford argues that there is no competent evidence that the children were living in squalor, that termination was recommended without having seen the inside of the residence, and that other testimony shows the living conditions are now appropriate. Further, there is no evidence connecting the living conditions with any resulting danger to the children's emotional or physical well-being. The Department contends that the evidence shows that Crawford's residence was filthy and unsanitary, that there was domestic violence in the home, that there was drug abuse in the home, that Crawford knew Dickinson had a mental illness and posed a threat to the children, and that Crawford's history of criminal behavior created a high risk that he would be incarcerated in the future.

### Applicable Law

Section 161.001(1)(D)of the Texas Family Code states that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. TEX. FAM.CODE ANN. § 161.001(1)(D) (Vernon 2002). This provision addresses the child's surroundings and environment, rather than parental conduct. *In re N.R.*, 101 S.W.3d 771, 775–76 (Tex.App.-Texarkana 2003, no pet. h.); *In re R.D.*, 955 S.W.2d 364, 367–68 (Tex.App.-San Antonio 1997, pet. denied); *Ybarra v. Texas Dep't of Human Svcs.*,

869 S.W.2d 574, 577 (Tex.App.-Corpus Christi 1993, no writ).

"Endanger" means to expose to loss or injury or to jeopardize. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987); *In re D.M.*, 58 S.W.3d 801, 811 (Tex.App.-Fort Worth 2001, no pet.). Endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment. *Boyd*, 727 S.W.2d at 533; *In re D.M.*, 58 S.W.3d at 811. Nonetheless, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. Rather, it is sufficient that the child's well-being be jeopardized or exposed to loss or injury. *In re J.J.*, 911 S.W.2d at 440.

The Department must show that the child's living conditions pose a real threat of injury or harm. *In re N.R.*, 101 S.W.3d at 776; *Ybarra*, 869 S.W.2d at 577. Further, there must be a connection between the conditions and the resulting danger to the child's emotional or physical well-being. *Ybarra*, 869 S.W.2d at 577–78. However, it is not necessary for the parent to have certain knowledge that an actual injury is occurring. *In re N.R.*, 101 S.W.3d at 776. It is sufficient that the parent was aware of the potential for danger to the child in such environment and disregarded that risk. *Id.* The relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the child was removed. *Ybarra*, 869 S.W.2d at 577.

Unsanitary conditions can qualify as surroundings that endanger a child. *Leal v. Texas Dep't of Protective and Regulatory Svcs.*, 25 S.W.3d 315, 325 (Tex.App.-Austin 2000, no pet.), *disapproved on other grounds*, 96 S.W.3d 256, 267 & n. 39 (Tex.2002). Moreover, abusive

or violent conduct by a parent or other resident of a child's home can produce an environment that endangers the physical or emotional well-being of a child. *D.O. v. Texas Dep't of Human Svcs.*, 851 S.W.2d 351, 354 (Tex.App.-Austin 1993, no writ), *disapproved on other grounds*, 96 S.W.3d 256, 267 & n. 39 (Tex.2002); *In re B.R.*, 822 S.W.2d 103, 106 (Tex.App.-Tyler 1991, writ denied). We have previously concluded that it is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis in his home, are not inherently a part of the "conditions and surroundings" of that place or home. *In re B.R.*, 822 S.W.2d at 106. This statute is designed to protect a child from precisely such an environment. *Id.* Further, an environment which routinely subjects a child to the probability that he will be left alone because his parents are once again jailed endangers both the physical and emotional well-being of a child. *In re S.D.*, 980 S.W.2d 758, 763 (Tex.App.-San Antonio 1998, pet. denied). Conduct that results in such a disability, and that subjects a child to a life of uncertainty and instability, endangers the child's physical or emotional well-being. *Id.*

### Analysis

▬ Floyd and Diesch testified about Crawford's behavior, the condition of Crawford's premises, and their knowledge of the events that transpired between October 9 and October 11, 2001 as set forth above. Further, the record reflects that at the time of trial, Crawford was incarcerated in the Henderson County jail for the retaliation incident and would soon enter a drug treatment program.

Crawford lived with Dickinson for about eleven years and knew that she has been diagnosed with a mental illness. However, he testified that he believed Dickinson was capable of being a responsible parent. In a 1997 proceeding, a court returned C.L.C. to Crawford's custody with orders that Dickinson be allowed supervised visitation only. At that time, Crawford agreed Dickinson posed a threat to C.L.C. Nonetheless, Dickinson was living with Crawford when he regained custody of C.L.C. Moreover, Crawford testified that a "homemaker" came to the house approximately six to nine months prior to this case and dismissed them from the Department as "no problems," after which Dickinson was allowed to live with the children. Crawford contends that he allowed Dickinson unsupervised contact with C.L.C. after the "homemaker's" visit and the Department's dismissal of their case.[3] Crawford had a second child with Dickinson in 2000.

Crawford admitted that he and Dickinson have trouble dealing with stressful situations. He also admitted that Dickinson is "not totally right without her medication," and that she has abused a prescription drug. Crawford was also concerned about Dickinson using that prescription drug and "it happening with the children." Further, he admitted there is a slim possibility that he might move back in with her after he is released.

Regarding alleged drug abuse, Crawford testified that he had inhaled chemicals to get high but never when the children lived with him, while the children were in his custody, or while they were in his presence. Later, however, he admitted that he "huffed" when the children were in his custody, and admitted that he had a drug problem. Crawford stated that inhaling

---

**3.** Counsel for Dickinson requested the judge take judicial notice that an order was signed in June of 1998 dismissing the 1997 case involving Crawford, Dickinson, and C.L.C.

"eases all the stress," but causes him to do "undesirable things," and admitted that inhaling affects his ability to reason and make decisions. Crawford denied admitting to a caseworker that he was "huffing" carburetor cleaner on the day Floyd came to his house and denied testifying similarly at a revocation hearing in 2002. He also denied using other illegal drugs for years and denied testing positive for marijuana in May of 2001.

Crawford admitted he consumed alcohol while the children were in his custody but denied being a big drinker until the children were removed. After being arrested several times for public intoxication, he voluntarily checked himself into a drug treatment center. Upon release, Crawford voluntarily turned himself in to police regarding a probation violation based on the public intoxication arrests. Crawford then requested entry into a drug treatment facility in order to have a relationship with his children. Further, Crawford testified that he wanted some help.

Crawford agreed that his relationship with Dickinson has, at times, been volatile. He has slapped Dickinson a time or two, but never hit her. Further, he stated that the children were never present during their fights. During their relationship, he was arrested based on Dickinson's statements but those charges were later dismissed. Crawford denied that he committed a list of alleged incidents of domestic violence against Dickinson. Crawford also denied an incident at a liquor store with Dickinson. Although he remembered Dickinson got a restraining order against him, he stated the underlying factual allegations were false. In her investigation, Diesch spoke with C.L.C. who confirmed a report of an incident in which Crawford was shooting a weapon at the burn barrel from the roof of the home while Dickinson and C.L.C. were lying on the ground in the yard. Crawford denied the incident occurred. Further, C.L.C. stated that his parents would sometimes leave him and his brother alone.

Dickinson admitted being diagnosed as bipolar and being committed to Terrell State Hospital for mental illness. She denied abusing prescription drugs. Dickinson testified that Crawford physically abused and hit her in the past, but denied that she told a caseworker that he drank and was violent. Dickinson either denied or did not recall numerous alleged incidents of domestic violence perpetrated against her by Crawford. Dickinson denied that any assault occurred while the children were living with her or in front of the children. Although she stated that their arguments became physical sometimes, she denied that she had ever hit Crawford or that he had shot at her. Dickinson denied any intention of moving in with Crawford when he is released.

Denise Killgore ("Killgore"), the family's case worker with Child Protective Services in Henderson County, met Crawford in the Henderson County jail on October 15, 2001. Killgore discussed a family service plan with Crawford on that date. Later, Crawford told her he had a "huffing" problem and wanted help. Killgore believed Crawford tested positive for marijuana in 2001. According to Killgore, Crawford denied "everything" on his criminal history record. Crawford admitted to Killgore that the children had witnessed domestic violence between him and Dickinson and that he "huffed" while in possession of the children. Crawford was also aware that Dickinson had a problem with prescription drugs. Killgore stated that Crawford was worried about her "driving like that." However, Crawford stated that Dickinson never drove with the children "like that," intimating that she never drove the children while abusing a prescription drug.

According to Killgore, there was "zero progress" by the parents as well as episodes of violence.

John Bell ("Bell"), a deputy with the Henderson County Sheriff's Department, testified regarding a dispatch he received in September 2001. The call was about a fight in front of a liquor store between a man and a woman that might involve a knife. When he responded, Bell spoke to Crawford and Dickinson at a nearby gas station and observed that Crawford had blood on his face and chest. Bell was aware that Crawford has been arrested twice for domestic violence. Further, Bell responded to domestic violence calls at Crawford's residence approximately six or seven times since 1995. He also witnessed physical injuries on both parents. The only time a child was present was in 1995, and he confirmed that there had been actual domestic violence on that call. According to Bell, it was rare for him to talk to Crawford when he was not intoxicated.

Based on the home situation, domestic violence, and drug abuse, Diesch believes Crawford placed the children in conditions or surroundings which endangered their physical or emotional well-being. However, Diesch admitted that she was not happy with Crawford and that she took this case personally. Diesch admitted that, other than the incident at her office, she never witnessed any violence nor had she witnessed any drug abuse. Further, her opinion regarding the conditions of the home were based only on the condition of the yard outside.

Killgore testified that Crawford knowingly placed the children in conditions or surroundings that endangered them. Killgore cited several factors for her opinion including the domestic violence, Crawford's huffing and being under the influence of alcohol and drugs while in front of the children, and repeated Department involvement. Killgore admitted that the inside and outside of the house are now appropriate. In her opinion, witnessing domestic violence is emotionally damaging for children. However, Killgore also admitted that there is no evidence the children were physically injured or emotionally damaged by Crawford. The children have never seen a psychologist or psychiatrist to determine if their emotional well-being had been affected. Vicki Sussen ("Sussen"), an employee of CASA, believes the evidence shows that the children had been knowingly and willingly left in danger.

Viewing the evidence in the light most favorable to the finding, a reasonable fact finder could have concluded that Crawford was under the influence of drugs while the children were in his custody, that the house and yard were both unsanitary and unsafe, that Crawford committed domestic violence, and that he left the children with their mentally ill mother whom he acknowledged posed a danger to them. Therefore, we conclude that the evidence, viewed in the light most favorable to the finding, is sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that Crawford knowingly placed or knowingly allowed his children to remain in conditions or surroundings which endangered their physical or emotional well-being.

Although there is conflicting testimony regarding the present condition of the home, the lack of psychological evidence that the children were damaged, and that domestic violence occurred in the presence of the children, the trial court could have resolved this conflict in favor of its finding. The trial court could have disbelieved Crawford's testimony that the house was not dirty, that the children never witnessed domestic violence, that Dickinson was not a danger to the children, and that

the children were not damaged by their environment and surroundings. Further, the trial court could have found that Crawford's drug abuse, violence, and repeated arrests were conditions that endangered the children's physical or emotional well-being. Although there is some disputed evidence, we find that this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that Crawford knowingly placed or knowingly allowed his children to remain in conditions or surroundings which endangered their physical or emotional well-being. Accordingly, Crawford's first issue is overruled.

## TERMINATION UNDER SECTION 161.001(1)(E)

Crawford contends that the evidence is legally and factually insufficient to support a finding that he engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. Crawford argues that his housing situation was stable, that he was not frequently incarcerated, that there is no evidence he left the children with improper parties, that he substantially complied with the Department's service plan, that he never used illegal drugs in the presence of his children, and that there is no evidence that the children were physically or emotionally harmed by him. The Department contends that Crawford is incapable of providing a stable, secure, and safe home, that he had engaged in domestic violence with Dickinson while the children were living in the home, that he used drugs while in possession of his children, that he exposed the children to Dickinson who was mentally ill and abused prescription drugs, and that he engaged in dangerous activity involving firearms.

### Applicable Law

Section 161.001(1)(E) of the Texas Family Code states that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. TEX. FAM.CODE ANN. § 161.001(1)(E) (Vernon 2002). The specific danger to the child's well-being need not be established as an independent proposition, but may instead be inferred from parental misconduct. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. Further, scienter is not required for an appellant's own acts under section 161.001(1)(E), although it is required when a parent places his child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n. 9 (Tex.App.-Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at 200.

As previously discussed, "endanger" means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re D.M.*, 58 S.W.3d at 811. It is not necessary that the conduct be directed at the child or that the child actually suffers injury; rather, it is sufficient that the child's well-being be jeopardized or exposed to loss or injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex.App.-Dallas 2003, pet. filed); *In re D.M.*, 58 S.W.3d at 811. It is inconsequential that the parental conduct occurred before the

child's birth. *In re U.P.*, 105 S.W.3d at 229; *In re D.M.*, 58 S.W.3d at 812. Instead, courts look to what the parent did both before and after the child's birth to determine whether termination is necessary. *In re D.M.*, 58 S.W.3d at 812. Further, termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex.App.-Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well-being is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634.

▇▇▇▇▇▇ Imprisonment is a factor to be considered by the trial court on the issue of endangerment. *Boyd,* 727 S.W.2d at 533; *In re M.D.S.*, 1 S.W.3d at 199. Mere imprisonment, standing alone, will not constitute engaging in conduct which endangers the emotional or physical well-being of a child. *Boyd,* 727 S.W.2d at 533; *In re D.M.*, 58 S.W.3d at 812; *In re M.D.S.*, 1 S.W.3d at 199. A parent's voluntary, willful, and conscious engagement in conduct that he knows may result in imprisonment is also insufficient to support termination of parental rights. *In re D.T.*, 34 S.W.3d at 636. If the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding under section 161.001(1)(E) is supportable. *Boyd,* 727 S.W.2d at 534; *In re D.M.*, 58 S.W.3d at 812; *In re M.D.S.*, 1 S.W.3d at 199.

### Analysis

▇▇▇▇ In addition to the evidence previously discussed, Dr. Timothy James Furlong ("Furlong"), a staff psychiatrist at the Andrews Center, testified that he attempted to perform a psychological evaluation on Dickinson through a clinical interview in 1996. However, she was not fully cooperative and was experiencing psychotic symptoms. Furlong stated that there was evidence Dickinson had a psychotic mental illness, but he was unable to make a definitive diagnosis. In 1999, Dickinson began to see Furlong. He prescribed medications and, in April of 2002, Furlong requested Dickinson be committed to Terrell State Hospital because of allegations that she was suicidal, misusing prescription drugs, and abusing carburetor cleaner as an inhalant. Dickinson did not recall reporting to a Department caseworker that Crawford threw her on the ground, sat on her, and kicked her in the stomach after she told him she might be pregnant. Moreover, she stated that she had never seen Crawford physically abuse or hit the children.

Amy Michelle Young ("Young"), the children's caseworker for Child Protective Services in Henderson County, testified regarding a visit on March 5, 2002 with Crawford, Dickinson, and the children at a McDonald's restaurant. Dickinson was driven to the visit by Albert Pritchett ("Pritchett"). Crawford was not walking straight and his speech was slurred, and Young believed Crawford was intoxicated for the visit. C.L.C. seemed scared and uncomfortable when Crawford showed him a deep wound on his hand. When Young asked Crawford to lower his voice, he jumped up, slammed his hands on the table, and stated that he was not happy. He called the Department staff "liars," said "you people have got my kids," and cursed loudly in the restaurant with the children present. In response, C.L.C. backed away, went to a table in the corner, placed his fingers in his ears, and rocked back and forth. Young was concerned for her own safety as well as the children's safety. She stated that the situation was unmanageable. Due to Crawford's behavior,

Young terminated the visit. In the parking lot, Crawford got into the passenger seat of the car occupied by Pritchett and began beating Pritchett with his fist. Young testified that the children witnessed Crawford's actions.

Regarding the visit at McDonald's, Crawford admitted he had a confrontation with Pritchett. Crawford denied that his children witnessed his fight with Pritchett or that he was screaming, yelling, and cursing at the Department's employees inside the restaurant. Crawford denied beating Pritchett in the face.

On March 6, 2002, after the incident at the McDonald's restaurant, the Department changed its goal for the children to termination of parental rights. Diesch believes Crawford engaged in conduct which endangered his children's physical and emotional well-being based on his violence and drug abuse. Sussen recommended termination of Crawford and Dickinson's parental rights based on the evidence at trial, the parents' history since 1995, and the fact that the parents knew the consequences of their actions.

According to Killgore, Crawford engaged in activities or conduct which endangered the children's physical or emotional well-being. Her opinion was based on all Department reports, Killgore's own observations of Crawford's and Dickinson's individual behavior and their interactions with one another, what both parents told her, and Crawford's repeated arrests. Moreover, Killgore stated that Crawford admitted the children had witnessed domestic violence between him and Dickinson, that he had been high in front of the children, and that he and Dickinson "huffed" together after the children were removed. In her opinion, witnessing domestic violence is emotionally damaging for children. Further, by placing the children with their mother, Crawford engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children.

Viewing the evidence in the light most favorable to the finding, a reasonable fact finder could have concluded that Crawford left the children with Dickinson who was mentally ill and a danger to the children, that Crawford abused drugs while the children were in his custody, that Crawford perpetrated numerous instances of domestic violence against Dickinson, that Crawford had repeated arrests, and that Crawford was violent toward others in the presence of the children. Therefore, we conclude that the evidence, viewed in the light most favorable to the finding, is sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that Crawford engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being.

Although there is conflicting testimony regarding Dickinson's stability and whether the children witnessed the domestic violence or Crawford's drug abuse, the trial court could have resolved this conflict in favor of its finding. The trial court could have disbelieved Crawford's testimony that Dickinson was not a danger to the children, that the children never witnessed the domestic violence, and that the children were never present when Crawford was under the influence of drugs. Although there is some disputed evidence, we find that this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that Crawford engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-be-

ing. Accordingly, Crawford's second issue is overruled.

### BEST INTEREST OF THE CHILD

We now turn to the trial court's finding that termination is in the best interest of the child.

### *Applicable Law*

■ In determining the best interest of the child, a number of factors have been considered including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976).

■ This list is not exhaustive, but simply indicates considerations which have been or could be pertinent. *Id.* However, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d at 814. The *Holley* test focuses on the best interest of the child, not the parent's best interest. *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex.App.-Dallas 1995, no writ). While incarceration is a factor in determining the best interest of a child, it is not dispositive. *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). In determining the weight of this factor, the court should consider the expected length of an appellant's imprisonment and whether it can be inferred from an appellant's

criminal conduct that he has endangered the safety of the child. *Id.*

### *Analysis*

■ In addition to the evidence previously described, there was testimony regarding the programs available to assist Crawford. Crawford recalled that the family service plan listed a group of requirements to be met. He understood that noncompliance would affect his ability to have a relationship with his children in the future. Although he told the Department that he would do anything to get his children back and that he loved his children, he did not attend counseling as often as ordered and did not attend parenting classes because he claimed the class was full. He attended Alcoholics Anonymous only about twenty times and admitted that he "didn't get near done what [he] was supposed to get done done."

Crawford was required to attend Alcoholics Anonymous as part of his family service plan. Killgore believed that he attended some meetings while in rehab before going to jail. Both parents attended one meeting with a therapist who recommended visitation for everyone's benefit. Further, he did get a drug assessment while in jail but did not follow the recommendation. Crawford's drug test while in jail was clean. Moreover, Crawford and Dickinson informed Killgore that they did not have any problems and they did not want to seek counseling, attend parenting classes, or go to drug treatment. From the date of her first meeting with Crawford until the time of trial, Killgore described Crawford's compliance with his service plan as "generally noncompliant."

There was additional testimony regarding the parental abilities of Crawford. Killgore admitted that Crawford acted appropriately toward his children on the occasions she was present. He interacted

better with C.L.C., got very emotional, smiled a lot, and asked the children questions about how their life was going. He seemed to miss the children and to love them. Further, she believes that C.L.C. loves Crawford. Dickinson stated that Crawford loves his children. Young admitted that Crawford acted appropriately at other visits she supervised, although she stated that there did not appear to be a bond between children and parents. Floyd admitted that the children did not appear dirty when he observed them.

There was also additional testimony regarding the acts or omissions of Crawford which indicate that the existing parent-child relationship was not a proper one, that the home was not stable, and that the children are in emotional and physical danger now and in the future. Dr. Paul Andrews ("Andrews"), a clinical psychologist, performed a psychological evaluation on Crawford in October of 2001. Based on the tests, interview, and other information, Crawford was diagnosed with adult antisocial behavior. Andrews opined that Crawford was probably depressed and had a personality disorder marked by histrionic narcissistic and antisocial personality disorders. He also recommended a substance abuse assessment. In Andrews's opinion, Crawford's diagnosis is incongruent with good parenting practices because of the self-centeredness and lack of regard for others commonly manifested with these personality disorders.

Killgore received a telephone call on February 5, 2002 from Dickinson who sounded very upset. She stated that Crawford had beaten her when she informed him that she might be pregnant. According to Dickinson, Crawford knocked her down, kicked her, sat on her stomach, and was drunk during the attack. Killgore recommended termination of Crawford's parental rights. Diesch stated that Craw-

ford's parental rights should be terminated. Young believes that Crawford's parental rights should be terminated because she does not believe he is in a state to be an appropriate parent. Sussen believes it is in the best interest of the children that Crawford's rights be terminated.

Viewing the evidence in the light most favorable to the finding, a reasonable fact finder could have concluded that Crawford was under the influence of drugs while the children were in his custody, that the home was unstable, that Crawford's compliance with the family service plan was negligible, that Dickinson was mentally ill and a danger to the children, that Crawford perpetrated numerous instances of domestic violence against Dickinson, that Crawford was repeatedly arrested, and that Crawford was violent toward others in the presence of the children. Therefore, we conclude that the evidence, viewed in the light most favorable to the finding, is sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that terminating Crawford's parental rights is in the best interest of the children.

Although there is conflicting testimony regarding the relationship between Crawford and his children, Dickinson's stability, and whether the children witnessed the domestic violence or Crawford's drug abuse, the trial court could have resolved this conflict in favor of its finding. The court could have disbelieved Crawford and Dickinson when they testified that the children never witnessed the domestic violence, that Crawford was never under the influence of drugs in the presence of the children, and that Dickinson was a capable parent. Although there is some disputed evidence, we find that this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm

belief or conviction that terminating Crawford's parental rights is in the best interest of the children. Accordingly, Crawford's third issue is overruled.

CONCLUSION

Based upon our review of the record, we conclude that the trial court did not err in finding that Crawford knowingly placed or knowingly allowed his children to remain in conditions or surroundings which endangered their physical or emotional well-being, and engaged in conduct or knowingly placed his children with persons who engaged in conduct which endangered their physical or emotional well-being. Further, the trial court did not err by finding that terminating Crawford's parental rights is in the best interest of C.L.C. and C.R.D. Therefore, the *judgment* of the trial court is *affirmed.*