

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-12-00538-CV

---

IN THE INTEREST OF T.B., K.Y., D.R., AND D.R., CHILDREN

---

On Appeal from the County Court at Law No. 3
Lubbock County, Texas
Trial Court No. 2010-554,753, Honorable Paula Davis Lanehart, Presiding

---

May 31, 2013

## MEMORANDUM OPINION

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

In this case, the mother[1] and the attorney ad litem for the mother's children T.B., K.Y., D.R.-1, and D.R.-2 appeal the trial court's order terminating the parent-child relationship between the mother and K.Y., D.R.-1, and D.R.-2.[2] The parental rights of

---

[1] T.B., K.Y., D.R.-1, and D.R.-2 were ages fifteen, eleven, eight and six respectively at the time of trial. We identify the mother only as such, and the children only by their initials, to protect the identities of the children. *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2012); Tex. R. App. P. 9.8(a),(b)(2).

[2] The mother's parental rights to T.B. were not terminated. Appellee the Texas Department of Family and Protective Services was appointed the child's permanent sole managing conservator and the mother his possessory conservator. The portions of the order concerning T.B. are not challenged on appeal.

Robinson, the father of D.R.-1 and D.R.-2, and Williams, the father of K.Y, were terminated on a best interest finding after each executed an affidavit of relinquishment of parental rights according to Family Code Chapter 161.

Through three issues, the mother challenges the sufficiency of the evidence supporting the trial court's findings of two termination predicate grounds and its finding that termination is in the best interest of the children. The attorney ad litem presents a single issue challenging the sufficiency of the evidence supporting the best interest finding. Robinson and Williams do not appeal the trial court's order. We will affirm.

Background

The evidence focused on conditions and events in the mother's and children's lives during 2009 and years following.

During 2009 the Department became involved with the mother through a Family Based Safety Services case arising from a report that D.R.-1 and D.R.-2 were begging for food outside a convenience store. Law enforcement investigated and arrested the mother on an outstanding warrant. The children were sent to their maternal grandmother.

The Department's present involvement with the mother and the children began in May 2010 when the Department investigated a report that the mother and the children were unlawfully occupying an apartment. The mother told the investigator they were not evicted because the case had not been brought to court. According to the mother, she fed the children using food stamps. The apartment had an operable stove but no refrigerator. The investigator noted a mattress in one room and a couch in the living

room.  The mother explained she slept on the mattress and the children slept on the couch.

The leasing agent for the apartment the mother rented told the investigator that eviction was not completed because the mother was vacating the property.  The prospect of eviction arose because the mother and her mother were seeing men who "had been burglarizing the property and stealing water heaters from the property."

According to the investigator, the mother agreed to place the children with her uncle in Lubbock.  However, the children's stay with him was brief.  On June 3, 2010, the mother moved into other quarters.  There was evidence that in early July 2010, an electric utility company accused the mother of tampering with an electric meter.

During a November 2010 home visit with the mother, the Department investigator noted the residence "was in disarray."  While there was food and a means of food preparation the investigator also observed "clothing and debris all over the house."  There was no electrical service.  The Department sought emergency removal of the children and was appointed temporary managing conservator.  Shortly before Thanksgiving 2010, the mother moved into a Women's Protective Services shelter and then a Lubbock apartment.  Following removal, a new caseworker was assigned.

During January 2011, the mother moved to Amarillo and lived with Pittman, a male friend.  She found employment.  In a January drug analysis, the mother tested positive for cocaine.

Pittman's criminal record concerned the Department.  As a juvenile he was charged with injury to a child, elderly, or disabled person with intent to do serious bodily

injury and aggravated sexual assault of a child.  As an adult he was convicted in 2007 of misdemeanor possession of marijuana and theft and was incarcerated in a state jail in 2008 for fraud.

During May 2011, the mother and Pittman moved to a "rent-to-own" house which they occupied for some seven months.  But they were forced to vacate the property when it sold to another party.

During an August 2011 altercation, Pittman choked the mother and she called police.  He was arrested and jailed.  As a result, the Department asked Pittman to complete a plan of services including anger management classes.  He began but did not complete the classes.  The mother and Pittman were informed by the caseworker that he must attend anger management classes and family therapy before having any contact with the children.  Pittman verbally consented to the requirement.

By December 2011, the mother was no longer in a relationship with Pittman.  The children were returned to her that month as she completed services and entered a placement agreement.  According to the terms of the placement agreement, the mother among other things agreed "to closely supervise her children and . . . not allow anyone in the home that could pose a threat to the children's emotional and/or physical well-being."  The trial court rendered an order of monitored return in February 2012.

In January 2012, the mother and the children moved to a trailer.  Because of distance and lack of transportation, she left her job.

During early February 2012, the Department received a report that Pittman might be in the home of the mother and the children.   The mother denied having contact with

Pittman. As for contact between Pittman and the children, the caseworker testified the mother was told "over and over again" not to allow unapproved individuals in the home. It was later determined Pittman picked up the children at school. On February 15, the mother and Pittman looked at a home for sale. The mother explained Pittman was helping her move but had no had contact with the children.

During March 2012, the mother called the police to "mediate" a family dispute centered on a stray dog T.B wanted to keep and which Pittman did not want at the mother's trailer. According to the mother Pittman, "would come over all the time." On March 15, 2012, the mother reported she no longer had contact with Pittman. During mid-March, she again became employed.

In April 2012, the Department discovered Robinson was again in the mother's home and having contact with the children. Robinson was not approved by the Department for occupying the home with the children because he was not working a plan of services. The Department based its concern with Robinson on a criminal history the caseworker stated included involvement in drugs, assault, and burglary.

By way of background, the mother's eight-year relationship with Robinson ended in 2009 when he was sentenced to prison. The mother indicated he abused crack cocaine. Following his release from incarceration, Robinson participated in supervised visitation with D.R.-1 and D.R.-2 at the Department's office before disappearing for several months.

The mother was aware of Robinson's criminal background including involvement with drugs. According to the caseworker, she and the mother discussed why

5

Robinson's contact with the children was not appropriate. And the mother received reports from the Department documenting Robinson's history.

Robinson personally appeared at the termination hearing although at the time he was incarcerated. He testified that the mother asked him to come to her home and wanted him to stay. Robinson said he remained with the mother for about a week. During this period, Robinson cooked and cleaned for the family and rode the bus each day with the mother as "she sent [Robinson] out looking for a job." He said he slept with the mother while in her home. She denied this claim and testified he stayed with her only two days.

Robinson left the mother's home and did not return after receiving a positive return for cocaine and marijuana on a voluntary drug test. When asked at the hearing if he used drugs after seeing the children Robinson responded "No" but immediately added "I plead the Fifth . . . ." To a question concerning his recollection of the positive drug test, Robinson again interposed the Fifth Amendment.[3]

The mother reported Robinson stole a portion of her rent money. She explained, "[Robinson is] a con-artist. He's been around—and he's been around them, for, I mean, I was with him for eight years, you know, he raised [T.B.], he probably told him some kind of incredible story . . . ." Later, the mother testified Robinson, "stole from everybody and everybody . . . ."

---

[3] In a civil case, the fact finder is free to draw negative inferences from a party's assertion of the privilege against self-incrimination. *Webb v. Maldonado,* 331 S.W.3d 879, 883 (Tex.App.--Dallas 2011, pet. denied) (citing Tex. R. Evid. 513(c); *Wilz v. Flournoy,* 228 S.W.3d 674, 677 (Tex. 2007).

Because of the mother's involvement with Robinson, the Department removed the children from her care in late April 2012, following Robinson's positive drug test. In its May 2012 order approving the end of the monitored return, the court cited Robinson's drug use among the grounds for its order.

The mother, evidence shows, was jailed on the day of the children's removal and remained incarcerated until June 26, 2012. Apparently her arrest related to the allegation of tampering with an electric meter. After her release, during October 2012, the mother began occupying an apartment with Pittman.

Among the exhibits admitted into evidence was the August 2011 evaluation of the mother by a psychologist. The psychologist also testified for the Department at the termination hearing. From a history, he noted the mother was jailed on five occasions and once imprisoned. The duration of her longest incarceration was fifteen months for possession of marijuana. She admitted using marijuana for thirteen or fourteen years, ingesting the drug three times per week. She denied, however, any marijuana consumption during the year preceding the evaluation. The mother reported using cocaine about twice a month until six months before the evaluation. While the mother tested positive for cocaine during January 2011, all subsequent tests were negative. The psychologist acknowledged on cross-examination that if the mother had not used drugs in the one-year period between the evaluation and the termination hearing, "then obviously her drug use is now not a problem."

Based on the results of a standardized personality inventory, the psychologist opined that the mother probably tended to blame others for her problems while having

difficulty accepting responsibility for her behavior. He further opined that as to working through a plan of services, her greatest difficulty was consistency. This included finding and maintaining employment, the capacity to meet her needs and those of the children, and understating the need for personal change. He summed up his opinion by describing the mother as having difficulty "taking care of the business of everyday life."

## Analysis

Through her first and second issues, the mother challenges the legal and factual sufficiency of the evidence supporting termination under the predicate grounds of subsections (D) and (E) of Family Code section 161.001. Tex. Fam. Code Ann. § 161.001(1)(D),(E) (West Supp. 2012). The attorney ad litem for the children does not challenge these predicate findings.

Termination of parental rights under Family Code § 161.001 requires proof by clear and convincing evidence that the parent committed one of the acts or omissions listed in § 161.001(1)(A)—(T) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(1),(2) (West Supp. 2012); *In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003). Clear and convincing evidence is the degree of proof that produces in the mind of the factfinder a firm belief or conviction of the truth of the allegations to be proved. *In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002).

Under the legal sufficiency analysis, we examine all of the evidence in the light most favorable to the challenged finding, assuming the "factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002). We disregard all contrary evidence the factfinder could

8

have reasonably disbelieved or found incredible. *Id.* However, we take into account undisputed facts that do not support the finding, so as not to "skew the analysis of whether there is clear and convincing evidence." *Id.* If the record presents credibility issues, we must defer to the factfinder's determinations provided they are not unreasonable. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005).

Although the issues as stated in the mother's brief address only the legal sufficiency of the evidence, her argument speaks also to its factual sufficiency. We also will address the evidence under both standards. Through the factual sufficiency analysis, we examine the entire record determining whether "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" as to the challenged finding. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.,* 96 S.W.3d at 266. If the evidence that could not be credited in favor of the finding is so great that it would prevent a reasonable factfinder from forming a firm belief or conviction that either of the statutory requirements has been met, the evidence is factually insufficient and the termination will be reversed. *Id.*

Subsection (D) allows termination of parental rights if the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(1)(D) (West Supp. 2012). The subsection concerns the child's living environment, rather than the parent's conduct, though parental conduct may be relevant to the child's environment. *See In re D.T.,* 34 S.W.3d 625, 632 (Tex.App.--Fort Worth

9

2000, pet. denied).[4]  Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child must regularly associate in his home is a part of the "conditions or surroundings" of the child's home in subsection (D).  *Castorena v. Tex. Dep't of Protective & Regulatory Servs.,* No. 03-02-00653-CV, 2004 Tex. App. Lexis 3753, at *24-25 (Tex.App.--Austin Apr. 29, 2004, no pet.) (mem. op.) (citing *In re B.R.,* 822 S.W.2d 103, 106 (Tex.App.--Tyler 1992, writ denied)); *see In re W.S.,* 899 S.W.2d 772, 776 (Tex.App.--Fort Worth 1995, no writ) (stating that "environment" refers not only to the acceptability of living conditions, but also to a parent's conduct in the home).  Subsection (D) permits termination of parental rights based on a single act or omission by the parent.  *In re L.C.,* 145 S.W.3d 790, 797 (Tex.App.--Texarkana 2004, no pet.).

It must be shown that the living conditions of the child pose a real threat of injury or harm.  *In re C.L.C.,* 119 S.W.3d 382, 392 (Tex.App.--Tyler 2003, no pet.).  And a connection must exist between the conditions and the resulting danger to the child's emotional or physical well-being.  *Id.*  The parent need not, however, have certain knowledge that an actual injury is occurring, but must at least be aware of the potential for danger to the child in such an environment and must have disregarded that risk.  *Id.*

Subsection (D), like subsection (E), requires proof of endangerment.  "Endanger" means exposure "to loss or injury; to jeopardize."  *In re M.C.,* 917 S.W.2d 268, 269 (Tex. 1996) (per curiam).  While "endanger means more than a threat of metaphysical

---

[4] In contrast, under subsection (E) the cause of the danger to the child must be the parent's conduct alone, demonstrated by the parent's actions as well as the parent's omission or failure to act.  *Doyle v. Tex. Dep't of Protective & Regulatory Servs.,* 16 S.W.3d 390, 394 (Tex. App.--El Paso 2000, pet. denied).

injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Texas Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987). A child is endangered when the environment creates a potential for danger of which the parent is aware but disregards. *In re S.M.L.,* 171 S.W.3d 472, 477 (Tex.App.--Houston [14th Dist.] 2005, no pet.). Endangerment can be exhibited by both actions and failures to act. *In re U.P.,* 105 S.W.3d 222, 233 (Tex.App.--Houston [14th Dist.] 2003, pet. denied). In general "conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.,* 129 S.W.3d 732, 739 (Tex.App.--Fort Worth 2004, pet. denied). Illustrative is the illegal drug use of a parent or caregiver. *See In re J.T.G.,* 121 S.W.3d 117, 125 (Tex.App.--Fort Worth 2003, no pet.) ("Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being").

We find the trial court could reach the conclusion clear and convincing evidence showed the mother knowingly placed or allowed the three children to remain in endangering conditions or surroundings. This evidence begins with the report that two of the children in 2009 were begging for food outside a convenience store. The court heard evidence that by May 2010 the mother and children faced eviction from their residence because of the criminal actions of men the mother was seeing. The conditions at the residence at which the mother and children lived in November 2010, including the absence of electrical service, lead to the removal of the children and the Department's appointment as temporary managing conservator. The monitored return

11

of the children ended in May 2012, in part because of Robinson's drug use. This is evidence of endangering conditions or surroundings. *See In re J.A.J.,* 225 S.W.3d 621, 627 (Tex.App.--Houston [14th Dist.] 2006), *aff'd in part, rev'd in part,* 243 S.W.3d 611 (Tex. 2007) (explaining subsection (D) refers to acceptability of child's living conditions such as a house without electricity, gas, or food).

Further, the court could have formed a firm belief the mother was aware of the risks to her children's well-being from contact with her paramours but chose to disregard those risks. She began a living arrangement with Pittman, who had a serious criminal background and who later assaulted her. The trial court was free to believe Robinson's testimony that she invited him back into her home in April 2012, despite her description of him as a "con-artist" who "stole from everybody." Evidence also showed the mother was jailed on the day of the children's removal and remained confined until late June. By October she began occupying an apartment with Pittman.

Contrary to the court's finding, there was evidence the mother was diligent to obtain employment, could complete the Department's plan of services, and, while her children were in the Department's care, was able to avoid illegal drugs. While that evidence shows the mother was capable of assuming parental responsibilities, it does not counteract the significant body of proof of endangering circumstances.

The evidence was legally and factually sufficient to support the trial court's finding of termination under the subsection (D) predicate ground. The mother's first issue is overruled. Review of her second issue, challenging the sufficiency of the evidence supporting termination under the subsection (E) predicate ground, is

12

unnecessary since an affirmative finding of a single predicate ground will support termination of the parent-child relationship under § 161.001. *See In re A.V.,* 113 S.W.3d at 362 (a finding of only one predicate ground will support termination when there is also a finding that termination is in the child's best interest); Tex. R. App. P. 47.1 (written opinion of appellate court must address every issue necessary to final disposition of the appeal).

Best Interest of the Children

The mother and the attorney ad litem for the children each challenge the sufficiency of the evidence supporting the trial court's finding that termination is in the best interest of the children.

The best interest of a child determination does not require evidence of a particular set of factors. *In re C.J.O.,* 325 S.W.3d 261, 266 (Tex.App.--Eastland 2010, pet. denied). In *Holley v. Adams,* 544 S.W.2d 367, 371-72 (Tex. 1976), the court provided a list of factors the trier of fact in a termination case may consider in determining the best interest of the child. These factors include (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing

parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

The *Holley* factors are not exhaustive, and there is no requirement that the Department prove all factors as a condition precedent to parental termination. *In re C.H.,* 89 S.W.3d at 27; *Adams v. Tex. Dep't of Family & Protective Servs.,* 236 S.W.3d 271, 280 (Tex.App.--Houston [1st Dist.] 2007, no pet.). The evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the children warrants termination of the parent-child relationship. *In re C.H.,* 89 S.W.3d at 28; *In re P.E.W.,* 105 S.W.3d 771, 779 (Tex.App.--Amarillo 2003, no pet.). And a best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re S.H.A.,* 728 S.W.2d 73, 86-87 (Tex.App.--Dallas 1987, writ ref'd n.r.e.). The trier of fact may measure a parent's future conduct by her past conduct and determine that it is in the child's best interest to terminate parental rights. *In re D.L.N.,* 958 S.W.2d 934, 941 (Tex.App.--Waco 1997, pet. denied), *overruled on other grounds by In re C.H.,* 89 S.W.3d at 26.

A parent's unstable lifestyle may support a finding that termination is in a child's best interest. *In re D.S.,* 176 S.W.3d 873, 879 (Tex. App.--Fort Worth 2005, no pet.). *Cf. In re J.B.W.,* 99 S.W.3d 218, 229 (Tex.App.--Fort Worth 2003, pet. denied) (holding that incarceration is one factor courts can consider when determining the best interest of a child in a termination case).

The law recognizes a strong presumption that the best interest of a child is served by keeping custody in the natural parents. *In re D.T.,* 34 S.W.3d 625, 641

14

(Tex.App.--Fort Worth 2000, pet. denied). We recognize also, however, that the court's inquiry examines the best interest of the child, not that of the parent. *Dupree v. Texas Dep't of Protective & Regulatory Servs.,* 907 S.W.2d 81, 86 (Tex. App.--Dallas 1995, no writ).

The children are placed with family members. They did not testify although from the record it is without dispute that each of the three wants to be returned to the mother. As an alternative, each appears to accept his present placement. K.Y. lives with an aunt and her husband in North Carolina. They are interested in adoption if the parent-child relationship with the mother is terminated. D.R.-1 and D.R.-2 are placed with Robinson's sister in Lubbock. Likewise, their adoption is possible. The mother testified to her plans for care of the children. Should her pending criminal charge lead to incarceration, a possibility she largely dismisses, she believes her mother, who lives in a retirement facility, will care for the children.

As noted, evidence supporting the court's finding the mother allowed the children to remain in endangering conditions also supports the finding termination is in their best interest. We need not recount that evidence here, but note that in summary it shows, clearly and convincingly, an instability in the mother's life and home, involving unstable housing, unstable and endangering male relationships, a pending criminal charge, and a history of drug usage. The court also saw the psychologist's August 2011 report containing a conclusion that the mother had a "poor" prognosis, and that "[g]iven what appears to be limited insight, poor decision making, and a history of limited coping capacity, the probability of future difficulties appears to be fairly elevated and [the mother] is likely to struggle in the future." From the evidence it heard of events

15

occurring in the months following the report, the court reasonably could have concluded the report was still accurate. "The need for permanence is the paramount consideration for the child's present and future physical and emotional needs. The goal of establishing a stable, permanent home for a child is a compelling interest of the government." *Dupree,* 907 S.W.2d at 87. *See generally In the Interest of C.C.K.,* No. 01-12-00347-CV, 2013 Tex. App. Lexis 1240, at *93 (Tex.App.--Fort Worth Feb. 7, 2013) (mem. op.) (noting the subject children's "key emotional and physical needs are a stable, secure, predictable, and consistent environment"). The evidence shows the mother loves her children and they want to be with her. We are unable to say, however, that such evidence has such significant bearing on the children's best interest as to preclude the court's conclusion that termination of the existing parent-child relationship is in their best interest.

We find the evidence supporting the trial court's finding that termination of the parent-child relationship with the mother was in the best interest of K.Y., D.R.-1, and D.R.-2 is legally and factually sufficient. The mother's third issue is overruled.

Conclusion

The judgment of the trial court is affirmed.


James T. Campbell
Justice

16