Opinion filed December 2,
2010

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-09-00321-CV

                                                    __________

 

              IN THE
INTEREST OF J.R.H. AND J.T.H., CHILDREN



 

                                   On
Appeal from the 29th District Court

 

                                                         Palo
Pinto County, Texas

 

                                                    Trial
Court Cause No. C42702

 



 

                                            M E M O R A N
D U M   O P I N I O N

 

            This
is an accelerated appeal of the trial court’s order terminating parental
rights.  We affirm. 

            James
Harvey is the father of J.T.H., and Brittany Harris is the mother of J.R.H. and
J.T.H.  Brad Guinn Allen is the adjudicated father of J.R.H. and is not a party
in this appeal.  At the time of trial, J.R.H. was three years old and J.T.H.
was two years old.  Harvey and Harris started dating when Harris was a few
months pregnant with J.R.H. and later had J.T.H. together.     The Department
became involved with the family when J.T.H. was hit by a car when he was one year
old.  At that time, Harris and Harvey were living with Harris’s mother and her
boyfriend in a travel trailer.  On the day of the incident, Harris put J.T.H.
in the playpen and went outside.  Her mother’s boyfriend took him out of the
playpen, and J.T.H. followed Harris outside.  When Harris came back inside, she
asked where J.T.H. was, and no one knew.  She then saw J.T.H. outside in the
street, and he was screaming.  Harris did not know what had happened to J.T.H.,
but it was later determined that he was hit by a car.  J.T.H. was care-flighted
to Cook Children’s Medical Center.  He suffered soft tissue swelling and bruising,
but he did not have any broken bones.

            The
Department filed suit in which it sought protection for the children,
conservatorship, and termination of parental rights.  The Department alleged three
acts or omissions as the basis for terminating Harris’s parental rights as to
J.T.H. and J.R.H. and terminating Harvey’s parental rights as to J.T.H.[1] 
It alleged that Harris and Harvey:

(1) 
knowingly placed or knowingly allowed the children to remain in conditions or
surroundings which endangered the physical or emotional well-being of the
children;

 

(2) 
engaged in conduct or knowingly placed the children with persons who engaged in
conduct which endangered the physical or emotional well-being of the children;

 

(3) 
failed to comply with the provisions of a court order that specifically
established the actions necessary to obtain the return of the children who have
been in the permanent or temporary managing conservatorship of the Department
for not less than nine months as a result of the children’s removal from the
parent because of abuse or neglect of the children.

 

The foster
parents filed a petition in intervention for termination of parental rights and
for adoption.  After the children had been in the Department’s conservatorship
for nine months, Harris and Harvey had worked most of the services but still
had not reached their goals for reunification.

            In
June 2009, on the Department’s motion, the trial court allowed the children to
return home to Harris and Harvey on a monitored placement.  However, the
children were once again removed from the home less than a month later.  The
Department cited its concern for the welfare and safety of the children as well
as the parents’ failure to follow the service plan as reasons for the removal.

            The
trial court held a bench trial pertaining to the termination of the parental
rights of Harris and Harvey as to J.T.H.  At the conclusion of the trial, the
court found that termination of Harris’s and Harvey’s parental rights as to J.T.H.
was in the best interest of J.T.H. and that both Harris and Harvey had:

 (1)
knowingly placed or knowingly allowed the child to remain in conditions or
surroundings which endangered the physical or emotional well-being of the child;
[and]

 

(2)
 failed to comply with provisions of the court order that specifically
established the actions necessary for them to obtain the return of J.T.H. who
had been in the permanent or temporary managing conservatorship of the
Department for not less than nine months as a result of his removal due to
abuse and neglect.

 

The trial court
further ordered that the Department be the permanent managing conservator of J.T.H.
and that Allen be the permanent managing conservator of J.R.H. with Harris
appointed as the possessory conservator of J.R.H.[2]

            In
separate briefs, Harvey and Harris appeal the trial court’s order terminating
their parental rights as to J.T.H. and J.R.H.  In one issue, Harvey asserts
that there is not clear and convincing evidence to support the grounds upon which
the trial court found that his rights should be terminated and that it would
not be in J.T.H.’s best interest for his rights to be terminated.  We assume
that with this issue Harvey is attacking the legal and factual sufficiency of
the evidence to support the trial court’s order. 

            In Harris’s
appeal, she challenges the trial court’s order as to the termination of her
parental rights to J.T.H in three issues.  In the first issue, she asserts that
the evidence was insufficient to support the trial court’s finding that she
knowingly placed or knowingly allowed J.T.H. to remain in conditions or
surroundings that endangered the physical or emotional well-being of J.T.H.  In
the second issue, she asserts that the evidence was insufficient to support the
trial court’s finding that she failed to comply with the provisions of a court
order that specifically established actions necessary for Harris to obtain the
return of J.T.H.  Finally, she asserts that there was insufficient evidence to
support the trial court’s finding that termination was in J.T.H.’s best
interest.

In
its brief, the Department concedes that there was
insufficient evidence to support termination under the grounds that Harris
knowingly placed J.T.H. in conditions that endangered his emotional and
physical well-being.  However, it argues that Harris does not challenge that
portion of the trial court’s order in which the trial court appointed the
Department as the managing conservator of J.T.H.   The Department also does not
concede error in regards to the trial court’s order terminating Harvey’s
parental rights to J.T.H.  Further, the intervenors, J.B. and R.B., do not
concede error as to the termination of either Harris’s or Harvey’s parental
rights.  We will, therefore, discuss their issues on appeal.

            Harvey
does not challenge the trial court’s specific finding on the reasons for
termination.  In his brief, Harvey states that the Department alleged those
conditions for involuntary termination that are set out in Tex. Fam. Code Ann. § 161.001(1)(D), (E)
(Vernon Supp. 2010).  However, the Department alleged, and the trial court
found, as grounds for termination those things set for termination in Section
161.001(1)(D), (O).  The trial court need only find that one of the statutory
grounds is true in order to support termination.  M.C. v. Tex. Dep’t of
Family & Protective Servs., 300 S.W.3d 305, 309 (Tex. App.—El  Paso
2009, pet. denied).  Because Harvey does not challenge the trial court’s
finding that he failed to comply with the provision of the court order that
specifically established the actions necessary for him to obtain the return of
J.T.H., we need not address his argument that the evidence was insufficient to
support the other ground found by the trial court.   

In
addition, Harvey waives any challenge to the trial court’s finding that
termination was in the best interest of J.T.H.  Harvey mentions the best
interest of the child one time in his brief.  He states in his issue on appeal:
 “[I]t would not be in the best interest of the child that the parental rights
between James Harvey and the child [J.T.H.] be terminated.”  Harvey does not
include any substantive analysis or discussion of the evidence in support of his
contentions.  See Tex. R. App. P.
38.1(h) (requiring an appellant’s brief to contain a clear and concise argument
for the contentions made, with appropriate citations to authorities and to the
record).  Because Harvey has failed to properly brief this issue and raise it
before this court, he has waived it.  We overrule Harvey’s issue on appeal.      

We
will now address Harris’s challenges to the sufficiency of the evidence. Due
process requires that the grounds for termination be established by clear and
convincing evidence.  In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002). This
requires a measure or degree of proof that will produce in the mind of the
trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established.  In re J.P.H., 196 S.W.3d 289, 292 (Tex.
App.—Eastland 2006, no pet.). 

To
determine if the evidence is legally sufficient, we review all the evidence in
the light most favorable to the finding to determine whether a reasonable trier
of fact could have formed a firm belief or conviction that its finding was true. 
City of Keller v. Wilson, 168 S.W.3d 802, 817 (Tex. 2005); In re J.F.C.,
96 S.W.3d at 266; In re J.P.H., 196 S.W.3d at 292. We must assume that
the factfinder resolved disputed facts in favor of its finding if a reasonable
factfinder could do so.  Phillips v. Tex. Dep=t of Protective & Regulatory Servs.,
149 S.W.3d 814, 817 (Tex. App.—Eastland 2004, no pet.).  We must consider all
the evidence, not only that which favors the verdict.  In re J.P.B., 180
S.W.3d 570, 573 (Tex. 2005).

To
determine if the evidence is factually sufficient, we review the entire record,
including evidence in support of and contrary to the judgment, and give due
consideration to evidence the trial court could have found to be clear and
convincing.  In re C.H., 89 S.W.3d 17, 25 (Tex. 2002).  We then
determine whether the evidence is such that a factfinder could form a firm
belief or conviction that grounds for termination exist.  Id.  We also
consider whether any disputed evidence is such that a reasonable factfinder
could not have resolved that disputed evidence in favor of its finding.  Id.


A
court may order the termination of the parent-child relationship if it finds by
clear and convincing evidence that a parent has knowingly placed or knowingly
allowed the child to remain in conditions or surroundings that endanger the
emotional or physical well-being of the child.  Section 161.001(1)(D).   Endanger
means to expose to loss or injury or to jeopardize a child’s emotional or
physical health.  Doyle v. Tex. Dep’t of Protective & Regulatory Servs.,
16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied).

The
evidence used to support this ground for termination concerns the child’s environment
and the acceptability of the child’s living conditions.  In re D.J.J.,
178 S.W.3d 424, 429 (Tex. App.—Fort Worth 2005, no pet.); In re D.T., 34
S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied).  The Department must
show that the child’s living conditions posed a real threat of injury or harm. 
In re C.L.C., 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.). 
Although it is not required that the parent have certain knowledge of an actual
injury, there must be evidence that the parent was aware of the potential
danger to the child and disregarded that risk.  In re C.L.C., 119 S.W.3d
at 392.  Conduct of a parent or of another person in the home can create an
environment that endangers the physical or emotional well-being of a child.  In
re W.S., 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ).

Elizabeth Clement testified that she is an investigator for
the Department.  She testified that she received a report that a one-year-old
was presented to the hospital for injuries that he sustained while he was not
being properly supervised by his mother and was struck by a car.  She testified
that she interviewed the parents, grandmother, and the nurses at the hospital. 
She testified that Harvey was asleep in the house at the time of the incident
and that Harvey told her that Harris was the primary caretaker of the
children.  Clement testified that Harris told her that she went outside to talk
to a friend and did not realize that J.T.H. had followed her.  When she came
back inside, she asked where J.T.H. was and then heard him screaming outside.  Clement
also testified that she talked to Harris’s mother, Karen Melton.  Melton told Clement
that J.T.H. followed Harris around wherever she went and that Harris could
expect him to follow her outside.  Clement testified that she visited J.T.H. at
the hospital.  She was concerned about the care and attention he was receiving
from Harris.  She testified that she had to tell Harris not to let J.T.H. stand
up on the bed because of the danger he would fall and had to remind her to
change his diaper.  She further testified that Harris mostly watched TV while J.T.H.
was in the hospital.  

Clement testified that, during her investigation, she found
the home unsafe for children.   The home had no air conditioning, there was an
electrical cord strung over the house, the carpet was ripped up, unsafe items for
children were in the front yard, and dogs were chained in the front yard. 
Because of the incident reported and the condition of the home, the Department
removed the children.

Donna Massey testified that she was the assigned caseworker
for J.T.H. starting in January 2009.  She testified that the Department
returned the children to Harris on June 15 and told Harris and Harvey she would
check on them periodically.  Massey testified that, the day after the children
were returned to Harris and Harvey, she went by the house and observed J.T.H.
and J.R.H. hanging out of a window with an almost three-foot drop.  Massey
testified that Harris did not seem concerned at all that the children were
hanging out of the window and in danger of falling.  Massey told Harris that
they needed to put a screen on the window.  However, Harvey fixed the window by
nailing it shut.  Massy testified that, after the children returned home, the Department
was presented with concerns about their safety and, after discussing it,
decided to remove the children again.  Massey testified that the reasons for
the second removal were because of the safety issue with the window, the house
was very hot without any air conditioning in the room where the children played
and slept, the failure to bond with the children, and the failure of Harris and
Harvey to demonstrate basic parenting skills.  Massey also testified that she
did not believe that Harvey and Harris could parent together as a team.  Harvey
left all the caretaking of the children to Harris, and when she asked him to
help, he ignored her.  Massey testified that, in her opinion, Harris could not
provide a safe and stable home for J.T.H.

Lena Biles testified that she was a case manager for Early
Childhood Intervention (ECI).  Biles testified that she had concerns with the home
not having an air conditioner.  She testified that J.T.H. was sleeping in a
bedroom with no air-conditioning and was being put to bed in his diaper only. 
She testified that it was very hot at that time.  Biles also testified that an
earlier house that Harris and Harvey lived in did not have gas because it was
turned off.  Biles testified that J.T.H. was clean in the foster home and that,
under Harris’s care, J.T.H. was cleaner than some children she works with. 
However, she noted that his diapers were not getting changed.

Harris testified that she was the primary caretaker of the
children.  On the day that J.T.H. was hit by a car, she had changed J.T.H.’s
diaper and put him back in the playpen.  Her mother’s boyfriend took him out of
the playpen, and she walked outside.  Harris testified that she knew that J.T.H.
was out of the playpen and that he liked to follow her.  Harris further
testified that she knew that J.T.H. would follow her outside when she went out
because he always followed her wherever she went.  She even left the door open
because she knew he would follow her.  She testified that she got distracted
and did not realize he was outside.  Harris testified regarding the window
incident that Massey observed.  She testified that she thought J.T.H. was
trying to open the window and that she had told him to leave it alone.  She
testified that she told Harvey that he needed to fix the window so that the
boys could not open it.  Harvey nailed the window shut to keep the children from
opening it.

Harris further testified that, while they did have an air
conditioner, it was not working very well.  She testified that she was told by the
caseworker that the children needed to sleep where there was air conditioning
and that she made a pallet for them on her bedroom floor.  She testified that
they now have an air conditioner that works.  Harris further testified that the
home that the Department approved for the “monitor and return” was the same
home that it argued at trial was an unsafe environment.

Harvey testified that the house they lived in had carpet
and air-conditioning in the room that the children spent most of their time.  He
had a steady job since May 2009 at the Holiday Inn Express and made minimum
wage.  Harvey worked nights and slept during the day while Harris took care of
the children.  Harvey also testified that, at the time of trial, they lived
with Mr. and Mrs. Gibson and their two children.  He had been saving his money so
that he and Harris could get their own house.  Harvey said that he sometimes depended
on the Gibsons for transportation because he did not have a driver’s license.

The evidence shows that Harris allowed J.T.H. to wander
outside by himself.   J.T.H. was sleeping in a room without an air conditioner during
the hottest part of the year.  Harris was aware of the risk this posed to the
children.  She let J.T.H. sleep in her own air-conditioned room when told by
the Department that the house was too hot for a baby to sleep without an air conditioner. 
The trial court, as the judge of the credibility of the witnesses, could have
disbelieved Harvey’s testimony that the house had an air conditioner and
carpet.  Massey testified that the house was not safe for young children.  Even
after the Department gave Harris the opportunity to show that she had learned
from the services offered by the Department, she was unable to keep the
children safe.  J.T.H. was trying to climb out of a window with a three-foot
drop below.  Harris was aware of this risk of danger because she told Harvey
that the window needed to be fixed and told J.T.H. not to try to open it.  

Further, Harris’s and Harvey’s lives were unstable.  They
rented two bedrooms of a four bedroom house in which six people lived.  Harvey’s
and Harris’s testimony indicated that they wanted to have their own place, but
nothing in the sixteen months before trial indicated that they were going to
have a stable lifestyle.  Harvey was unemployed for six months out of the sixteen
months that the Department had conservatorship of the child.  Prior to the
Department removing the children, his driver’s license was suspended due to his
failure to have liability insurance on his vehicle, and he has been unable to
get it back.

Based on the record before us, we believe that the evidence
was factually and legally sufficient to support the trial court’s finding that
Harris knowingly allowed J.T.H. to remain in conditions that endangered the
physical or emotional well-being of J.T.H.   Because we find that the evidence
was sufficient to support one of the grounds for termination, we do not need to
discuss the second ground listed in the trial court’s order.  We overrule Harris’s
Issues One and Two.

In
Harris’s third issue on appeal, she challenges the sufficiency of the evidence
showing that termination was in J.T.H.’s best interest. In parent-child
termination proceedings, there is a strong presumption that the child’s best
interest is usually served by keeping him with his natural parents.  In re
D.M., 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.); In re
K.C.M., 4 S.W.3d 392, 393-95 (Tex. App.—Houston [1st Dist.] 1999, pet.
denied).  Best interest does not require proof of any unique set of factors.  Holley
v. Adams, 544 S.W.2d 367, 372 (Tex. 1976).  However, the Texas Supreme
Court has recognized several factors to consider in determining whether
termination is in a child’s best interest.  Id.  These include: (1) the
desires of the child; (2) the emotional and physical needs of the child now and
in the future; (3) the emotional and physical danger to the child now and in
the future; (4) the parental abilities of the individuals seeking custody; (5)
the programs available to assist those individuals to promote the best interest
of the child; (6) the plans for the child by these individuals or by the agency
seeking custody; (7) the stability of the home or proposed placement; (8) the
acts or omissions of the parent that may indicate the existing parent-child
relationship is not proper; and (9) any excuse for the acts or omissions of the
parent.  Id. at 371-72.   This list of factors is not exhaustive, and no
single consideration is controlling.  In re D.M., 58 S.W.3d at 814.

The emotional bond between the child and parents may be
considered when determining the best interest of the child.  In re C.N.S.,
105 S.W.3d 104, 106 (Tex. App.—Waco 2003, no pet.).  When the child is too
young to express a preference, other evidence regarding the child’s current
placement is relevant.  In re M.D.S., 1 S.W.3d 190, 200 (Tex.
App.—Amarillo 1999, no pet.).  Massey, Biles, and Clement all testified that
Harris had not formed a bond with J.T.H.  Massey testified that J.T.H. was
doing really well in his placement with the foster parents.  He was eating
well, was in daycare, and seemed real happy.  The foster parents had expressed
an interest in adopting J.T.H.  Biles testified that she observed the children
in foster care and could tell a difference in how the children interacted.  She
testified that J.T.H. laughs and is more outgoing and self-confident.  She
testified that J.T.H. calls his foster mother “Momma.”  Harris testified that
she knew that J.T.H. was being well taken care of in his foster home.  She
further testified that his needs were being met and that he was comfortable.  Harvey
expressed concern about J.T.H.’s well-being in the foster home.  He testified
that, every time he saw J.T.H., he had a new bruise, a new red mark, or a new bump
on his head.  Harvey testified that he felt the horses the foster parents had
were just as unsafe as the home he could provide.

The record revealed several instances in which J.T.H.’s
emotional and physical needs were not being met under the care of Harris.  Harris
had to be told of the risks associated with J.T.H. standing up in the hospital
bed and had to be reminded to change his diaper.  While J.T.H. was in the hospital,
Harris was more interested in watching TV than keeping J.T.H. safe. Massey
testified that Harris seemed unaware of how to discipline J.T.H.  Once, when
Massey was with Harris and the children in Wal-Mart, J.R.H. was screaming and
crying and J.T.H. started to go out the door.  Massey testified that Harris
could not decide whether to take care of J.T.H.  She looked to Massey to handle
the situation.  Biles also testified that she was concerned about J.T.H.’s
diet.  She testified that, when interviewing Harris, she determined that the
children would eat dry cereal and Kool-Aid for breakfast, one-half of a hot dog
and Kool-Aid for lunch, and mashed potatoes and Kool-Aid for dinner.  Massey
testified that, on one occasion, she observed Harris sharing mashed potatoes
with J.T.H. for breakfast.

The record indicates that Harris worked the services
provided by the Department but was unable to apply what she learned in the
everyday parenting of J.T.H.  Massey testified that Harris and Harvey did not
submit to any of the services until six months after the children were removed.
 Massey further testified that they were doing the services and checking them off
one by one but were not applying them.  Harris always expected Massey to handle
the dressing, discipline, and feeding of the children when she was present. 
Biles also testified that she told Harris to feed J.T.H. cereal with a spoon
instead of a bottle.  Biles testified that Harris tried one time and J.T.H. was
not able to do it.  However, when Biles fed J.T.H. with a spoon, he did just
fine.  Harvey testified that he thought Harris relied on the Department too
much and that he had asked her not to be so dependent on them.

At trial, there was some argument as to why Harris’s rights
could be terminated as to J.T.H. but not as to J.R.H.  Massey testified that
the Department was not seeking termination of Harris’s rights to J.R.H. because
there was an appropriate parent with whom he could be reunified.  Further, it
would not be a hardship in this case to separate the siblings because they have
not lived together for very long.  J.R.H. lived with Harris’s sister for the
majority of his life. 

The evidence shows that Harris and Harvey have not provided
a stable home for J.T.H.  They have moved several times since J.T.H. was born. 
Harvey testified that they had to move from one house in Jacksboro because the
landlord would not fix the pipes and they had no running water.  He also
testified that they had to leave another house because the landlord sold it and
the new owners did not want to rent it.  Further, Biles testified that they
were in a home that had the gas turned off.  Harvey and Harris now rent two
bedrooms of a four bedroom house and live there with four other people.  Harvey
testified that he is saving up to get a place of his own.  However, he was
unemployed a majority of the time that the Department had conservatorship of
the children.  He obtained steady employment in May 2009, just over three months
before trial. Harris testified that money had always been an issue.  She
testified that she could not afford to put J.T.H. in daycare and J.R.H. in
preschool.  Harris could not afford to fill a ten dollar prescription for J.T.H.’s
ear infection.  Harris had not been able to provide a stable environment for J.T.H.
prior to the removal or while the Department had the children, and the record
does not demonstrate how that would change if her rights were not terminated.

Looking at all the evidence and analyzing the above listed
factors, we find that the trial court’s finding that termination was in J.T.H.’s
best interest was supported by clear and convincing evidence.  We overrule Harris’s
third issue on appeal.

            We
affirm the order of the trial court.

                                    

 

                                                                                                JIM
R. WRIGHT

                                                                                                CHIEF
JUSTICE 

 

December 2, 2010

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









[1]The
Department also initially sought to terminate Allen’s parental right to J.R.H.
but waived its claim at trial.





[2]
The Department was dismissed as to J.R.H.  No party has appealed this part of
the trial court’s order.