# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00139-CV

---

**A.R., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 453RD DISTRICT COURT OF HAYS COUNTY
### NO. 20-1207, THE HONORABLE SHERRI TIBBE, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A.R. (Mother) appeals from the trial court's decree terminating her parental rights to her four sons—Matt, Marcus, Lucas, and Dave—who were 7, 6, 5, and 4 at the start of trial.[1] Mother challenges the legal and factual sufficiency of the evidence supporting the predicate statutory grounds for termination. *See* Tex. Fam. Code § 161.001(b)(1)(D) (endangering environment), (E) (endangering conduct). She also challenges the legal and factual sufficiency of the evidence supporting the best interest finding and the conservatorship appointment. We affirm the trial court's termination decree.

## BACKGROUND

In late 2019, the Department of Family and Protective Services (the Department) received an intake that a domestic violence incident had occurred when Father (whose parental

---

[1] For their privacy, we will refer to the children by aliases and to their family members by their relationships to them or by aliases. *See* Tex. R. App. P. 9.8.

rights were already terminated in a previous proceeding) entered into Mother's home in violation of a protective order. The Department initiated a family-based safety services (FBSS) case, which was ongoing until the Department received another intake in June 2020, in which it was alleged that the four children were left unattended and "running around by themselves" at an apartment complex. Mother told the FBSS caseworker that her "boyfriend" was supervising the children, but Matt (the oldest child) stated that the "boyfriend" was actually Father and that Mother had instructed the children not to tell the FBSS caseworker and use a different name for Father. The Department thereafter filed its original petition on June 17, 2020, seeking termination of Mother's parental rights to her four children. Mother initially had supervised visits with the children at their placement with paternal grandmother. The Department later requested a placement change in October 2020 due to allegations that Mother was continuing to contact Father, and the children were ultimately placed into two separate foster homes.

A non-consecutive five-day bench trial began on February 28, 2022, before an associate judge.[2] Officer Jeremy Sembera testified first about the October 2020 incident. He testified that the paternal grandmother reported the trespass at the apartment, and when Sembera arrived, she identified Father as the individual who came to the apartment. Sembera testified that all four children were present, and he observed some were crying. He testified that the back door "looked like someone had attempted to break the door in" and that Father had fled the scene in Mother's vehicle. Mother refused to press charges for the vehicle theft because she stated that Father's violation of the active protective order "would be enough"; Sembera stated that Mother "just really wasn't cooperative."

---

[2] The trial court previously extended the dismissal deadline to April 1, 2022, pursuant to the then-applicable Supreme Court COVID-19 emergency orders.

Mariah Sharp, the FBSS caseworker, testified that Father's parental rights were terminated in a previous proceeding, that a protective order was put in place for Mother and the children, and that the children were placed with Mother. She explained that the FBSS case intake arose from a domestic violence incident where Father had entered Mother's home without invitation. However, she expressed concern that Mother was also allowing Father access to the children during the active protective order. She described the June 2020 intake received by the Department, where the children were found "running around by themselves" outside an apartment complex. She testified that Mother told her that Mother's "boyfriend" was supervising the children, but Matt (the oldest child) told Sharp that the "boyfriend" was actually Father and Mother had instructed the children to not tell Sharp. Sharp testified that the removal was necessary because Mother "continued to lie about her boyfriend," placed the children in danger by leaving them with Father, and had tested positive for cocaine. Sharp also expressed concern that Mother continued "to stay in this pattern" of completing recommended services and going back "to doing what she is not supposed to be doing," noting that there were approximately four previous intakes regarding domestic violence between Mother and Father over the last three to four years. She also was concerned that Mother coached the children not to talk to or mislead Sharp and that the children did not have structure and were "[n]ot very clean." Sharp did confirm that Mother appeared worried about Father being released from jail. Sharp also confirmed that she had no further contact with Mother after July 2020.

Annie Atwood then testified as the individual therapist for the two older children (Matt and Marcus). She also described previous individual therapy with the two younger children (Lucas and Dave). She summarized that the children were previously removed "due to reported drug usage, neglectful supervision, and the family was reportedly homeless in July of

3

2017." She stated that the children were in foster care for a year and a half before being returned. Atwood testified that Matt, who was six when therapy started, was physically aggressive, defiant, had instances of self-harm, and showed "significant deficits in his ability to trust adults." She described Matt's behaviors as "atypical" for a child of his age, and she testified that he showed behaviors indicating he had observed domestic violence, including punching walls, banging his head, and hitting his foster mother with his fist. She testified that Matt became less physically aggressive and stopped self-harm as therapy sessions progressed, but he displayed negative behaviors when family therapy sessions started with Mother and the other children. When asked whether Matt made any outcries of abuse or neglect, Atwood testified that none were made "directly" and that he did not display any signs of exposure to sexual violence or sexual abuse during play therapy. She expressed concern that, if Matt was reunited with Mother, his behaviors would escalate and he would revert back to a caretaker role of his brothers, "which in the past has been very overwhelming for him." She recommended termination of Mother's parental rights because of "the patten of abuse and neglect" and Matt's need for "caregivers that he can trust."

Atwood also testified that Marcus, who was five when therapy started, demonstrated that he did not feel safe, and he showed aggression and themes that he and his brother "were in constant need of being rescued from danger" and that "he saw the world as a dangerous and threatening place." When asked whether Marcus made outcries of abuse or neglect in his play therapy, Atwood answered in the affirmative. She described signs of physical aggression and "very concerning sexualized play with very explicit themes and acting out of explicit sexual acts that were well beyond what a five-year-old child should know about." She also testified that Marcus had exposed himself to one child and groped another at summer camp

4

and that he had also removed clothing from dolls during play therapy and simulated sexual intercourse with "very explicit sound effects." She testified that Marcus showed marked improvement in his behaviors and had "largely stabilized" by the late fall but that he had negative behavioral changes once family therapy sessions began with Mother and his brothers. Those negative changes included greater defiance and physical aggression towards his foster mother and at school, as well as increased "sexualized behaviors towards his foster mother." She recommended termination of Mother's parental rights, expressing concern about Mother's ability to be "protective" of Marcus given his traumatic history and his exposure "to sexual situations and possible sexual abuse."

Atwood also provided ten months of individual therapy for Lucas, who did not "show many overt behaviors with the exception of minor defiance." She testified that Lucas showed improvements in therapy, but his sexualized behaviors increased after visits with Mother started in October 2021; Atwood pointed to instances of Lucas groping another child at daycare and thrusting his pelvis in another child's face. She expressed concern about Mother's ability to protect Lucas, the abuse and neglect that occurred while in her care, and she recommended termination of Mother's parental rights. Atwood also provided therapy to Dave for four months, but she stated that he did not demonstrate many atypical behaviors for a two-year-old. She described positive behaviors in Dave as therapy progressed, but also noted an uptick in tantrums, "fear-based anxiety-related behaviors," and "verbalizations of feeling scared" when visiting Mother.

Atwood expressed concern about observing negative behaviors in all four children after visits with Mother restarted in October 2021. She testified that termination was in the best interest of the children because they had already experienced "significant disruptions" and was

5

concerned that sending the boys back risks "further abuse and neglect." Atwood conceded that she had not witnessed Mother's interactions with the children, that she did not definitively know the source of the children's behavior, and that she had not undertaken any investigation into the source of the children's behavior. Atwood also conceded that it was possible the behaviors could stem from a source other than Mother, but she later clarified that three of the four children have exhibited sexualized behaviors after placement, that those children are not in the same foster placement, and that the commonality between the children are the visits with Mother. She also testified that Matt stated that he would like to both be reunited with Mother and stay with his foster mother, and she stated that none of the other children expressed any preference to her.

Shaye Hicks, the individual play therapist for Lucas and Dave, testified that she had weekly sessions with Lucas and that he displayed behaviors indicating he had observed sexual behavior. She also testified that she observed Lucas having sexualized behaviors as well as increased aggression after he began having visits with Mother. Hicks testified that she saw Dave weekly and that he did not show many negative behaviors but showed lots of "aggression," such as throwing and breaking toys during the time period when he had visits with Mother. She recommended that Lucas and Dave not be reunited with Mother. On cross-examination, Hicks testified that she had not spoken with Mother, that it was "possible" the children could have suffered sexualization someplace other than the care of Mother, and that children also suffer trauma from being removed from their families, which can be expressed in aggressive behaviors.

Nicole Floyd, the behavioral interventionist at Lucas and Dave's school, testified that Lucas had been removed from his classroom because of aggressive behavior and that his behavior had escalated in October, which corresponded with the reintroduction of Mother into the children's lives. When discussing sexualized behaviors by the children, Floyd noted there

6

was one instance where Lucas "crossed a boundary with his teacher." She testified that Dave had more behavioral interventions than Lucas, that those were partly because of differences in their teachers' skills and partially because Dave has "more physical behavior," and that Dave's behavioral interventions also started occurring in October. She expressed no concerns about how the two children were treated in their foster home and had heard no outcries about abuse or neglect in the foster home.

Lucas's classroom teacher provided further testimony about Lucas's behavior at school, noting that Lucas began the year acting as a "normal child" but that his behavior abruptly changed in October 2021. She testified that Lucas "became more sexualized in nature for a child his age," referenced "naked parts," tried to touch the teacher's breasts, and thrust his pelvis at another student. She testified that this behavior continued from October until the beginning of February 2022. She confirmed she had not spoken with Mother about the behaviors because she is only allowed to speak to the current legal guardian of her students. She also testified that Lucas had indicated he wanted to live with his foster mother forever.

Foster Mother Claire testified about fostering Matt and Marcus, who were placed in her home in November 2020. She testified that when Matt arrived, he was six years old, could not put his shoes on the correct foot, could not brush his teeth properly, and had feces in his underwear on a regular basis. Marcus was five years old, was nonverbal other than simple words or phrases, could not dress himself, was only partially potty trained, and did not know how to brush his teeth. Foster Mother Claire testified that Matt made outcries of sexual abuse by Mother. She relayed an example when Matt told her that he would bathe with Mother, and another when Matt asked Foster Mother whether "licking a penis" and "licking a girl's butt" were inappropriate because he said Mother used to watch movies where that occurred. Matt

7

made another outcry in January 2022, stating that Mother regularly touched his private parts, indicating his penis and scrotum, while in the tub and that it "happened a lot." Foster Mother Claire also described sexualized behaviors by Marcus that became more frequent "immediately after" visits began with Mother. Those behaviors included trying to kiss her on the mouth and touching her breasts, and she stated that Marcus in one instance tried to choke her when she told him he was not allowed to touch her breasts.

Foster Mother Claire stated that both boys had positive behavioral changes since placement and were bonded with her grandchildren. She expressed a desire to adopt the boys, and she coordinated with the other foster placement so all four siblings could spend time together. She asserted that termination was in the older boys' best interest. On cross-examination, Foster Mother Claire testified that she saw some interactions between Mother and the children and described Mother as "lack[ing] of affection for her children." She conceded that the Department had "ruled out" an earlier allegation of sexual abuse, but she indicated that additional allegations were still being investigated. She testified that she does not discuss topics of sexual abuse with the children.

Foster Mother Gloria then testified as the foster mother for Lucas and Dave, who were almost four and almost three, respectively, at the time of their initial placement. She testified that Dave transitioned "fairly smoothly" but that Lucas struggled and lacked self-regulating behaviors to calm himself. Lucas was delayed in his expressive and receptive language and had no understanding of potty training, while Dave had a slight speech delay and low "gross motor skills." Foster Mother Gloria testified that Lucas had not made any direct outcries, but that he showed concerning sexualized behaviors; she noted that Lucas no longer presented sexualized behaviors or used sexualized language after his visits with Mother ceased.

8

Although Dave did not have many concerns when he first arrived, Foster Mother Gloria testified that he exhibited behavior changes after in-person visits began with Mother, with "every little thing [being] a full-on tantrum on the floor, screaming." She testified that Dave would repeatedly say before family therapy visits that "I do not feel safe. No thank you. I want to go home." She testified that since visits ceased Dave has settled and gone back to being "very laid back" and "chill[] about everything." Foster Mother Gloria agreed that termination was in the children's best interest, but she did not have plans to adopt the brothers; rather, she testified that another family who had acted as respite care providers were interested in adoption. She also testified that both boys expressed a desire to live with her and that they did not want to go back to family therapy with Mother.

Danielle McManus, the foster care case manager, testified about an instance of sexualized behavior by Marcus in January 2022 when he began kissing Foster Mother's arm in an inappropriate way and was disciplined and re-directed by the foster parent. She testified that she has received other incident reports from daycare and school. She testified that face-to-face visits were previously cancelled because of concerns about the boys' behavior and that the boys' behaviors "once family therapy started were more severe." McManus testified that Matt mentioned both wanting to go home with Mom and wanting to return to Foster Mother Claire; she stated that none of the other boys had expressed a particular interest. When asked further about Matt's statements, McManus explained that Matt told her that every time Father "gets out of jail, he shows up and then he [Matt] comes back into care."

Veronica Cavazos then testified regarding the six family therapy sessions for Mother and the children. She explained that the sessions began in October 2021 and that the children were excited and happy to see Mother. She testified that the children acted normally

and she did not see any sexual behaviors, comments, or remarks during the therapy sessions; she also noted that none of the children expressed any desires about whether they wanted to live with Mother. She also explained that, during the sessions, Mother was calm, engaged, and tried to give attention to her children. Cavazos testified that the sessions stopped in January 2022 "because of ongoing behavioral issues going on that were being reported to me," including behavioral outbursts, sexual inappropriateness, and aggression towards foster families.

Selena Shabani, the Department caseworker, then testified that the children were removed in 2020 after being found walking around an apartment complex by themselves and that there were concerns the children were around Father at the time. She referenced that both Matt and people around the apartment complex had identified Father as being at the apartment complex. The children were originally placed with paternal grandmother after removal until October 2020, when the Department became aware that the children were allowed contact with Father; the children were then removed to an emergency shelter and then foster placements. Shabani testified about Mother's compliance with her service plan, including maintaining and showing proof of employment and having appropriate housing. She agreed that Mother had been "pretty compliant" with the service plan requirements, although evidence was admitted of one failed drug test by Mother at the beginning of the case. Shabani also noted Mother had refused to take several other drug tests. She explained that Mother had visitation with the children from roughly January 2021 through June 2021, but those visitations were stopped because of the children's worsening behavior, including "tantrums, aggressiveness, enuresis, wetting themselves, nightmares." She stated that the children's behavior improved between June and October 2021, but then the boys showed "increased behavior" again when the children and Mother started family therapy in October 2021. Shabani testified that the Department was

10

seeking termination, that she had no concerns about the foster homes providing for the boys and their needs, and that individuals had been identified to adopt the boys.

On cross-examination, Shabani conceded that she had no knowledge of continued contact in 2021 between Mother and Father, that Mother was in compliance with her service plan, and that Mother had not expressed an intention to not comply. However, she expressed concern that Mother would contact Father if the Department was not involved, and when asked whether Mother is willing and able to provide a safe and stable home, Shabani qualified her answer with "[d]uring this case, yes." When asked whether Mother is able to reduce the risk of neglect, harm, or abuse to her children, Shabani responded that "[s]he's able to. Willing is a different question." Shabani also confirmed that the issues in the present case—domestic violence by Father and inability to stay away from Father—were also present in Mother's previous case.

The trial was resumed one month later on March 31, 2022. Foster Mother Claire was recalled to the stand, and she testified that Matt had been demonstrating self-harming behaviors and putting himself in danger. She described a recent event where Matt endangered himself by refusing to listen while at an event in a public park and she had to use a personal restraint technique to calm him. Foster Mother Claire agreed that the more recent behavioral issues were occurring even though he was not having consistent access to Mother.

Jasmine Warner, the CASA volunteer, testified that termination was in the best interest of the children and expressed concern about Mother's "inability or unwillingness to take responsibility for the reason why her children are in care, as well as her frequent denial or minimization of the issues that her kids are dealing with." Warner stated that the potential adoptive placements are appropriate and all four boys had individually expressed they would like

11

to be adopted. She also expressed concern about Mother's plans if the boys were returned and that she did not find Mother's relationship with her sons to be appropriate. Warner noted that, at the beginning of the case, she discussed with Mother that providing information on the "boyfriend" would "clear up any misunderstandings" but that Mother had refused to discuss it further. Warner clarified on cross-examination that she was not concerned that Mother denied allegations of sexual abuse, but she emphasized that Mother denies or minimizes behaviors expressed by the children. Warner also describes instances where Mother had given Warner false information, such as claiming she had "never in her life failed a drug test" even though she failed the initial drug test in the present case.

Mother then testified, claiming her children were originally removed because her "boyfriend" had left them unattended. When asked why Matt identified the boyfriend as Father, Mother testified that children will "eventually tell an adult what they want to hear." Mother admitted that the children observed domestic violence between Mother and Father, but she denied that she had bathed with the children since they were babies, had touched the children inappropriately, or had sex or watched pornographic movies in front of the children. Mother testified that she had maintained legal employment and safe and stable housing. She testified that she has not failed a drug screen since the initial drug screen two years ago and that the screenings she missed were because she was at work and unable to leave.

Mother testified that Father was not invited and instead broke into the home in October 2020 and that she had not seen him in almost two years. She denied allowing Father to see the children since his rights were terminated. She stated that she only had six family therapy visits with the children that were inconsistently scheduled, that she was supposed to have more regular visits, and that she has not had consistent visits with her children throughout the case.

12

She testified that the children are affectionate during family visits, that they still know who she is, and that they tell her they love her. She expressed plans to place the children into therapy, school, and daycare, as well as extracurricular sports and activities. She also stated that she received close out letters about three separate investigations of sexual abuse allegations, and she emphasized that she has never harmed her children. When asked about the children's knowledge of sexual matters beyond their age, Mother testified that she has "not witnessed that part of the issue with them." Mother testified that returning the children to her was in their best interest, that domestic violence was an issue for her in both cases but this time it would be different, and that the children had expressed a desire to return home during family therapy sessions. Mother also expressed concern that she did not find Foster Mother Claire truthful. At the end of Mother's testimony, the trial court appointed an attorney to investigate whether parental alienation was occurring.

The third day of trial was held two months later on May 23, 2022. Monica McClain—the new family therapist for Mother and her two older children—testified that there had been four sessions and that the visits "go okay." She expressed concern about the "influence" of Foster Mother Claire, that there were "signs" of parental alienation, and that she had concerns of coaching by Foster Mother Claire. McClain clarified that coaching "doesn't necessarily mean that they have not been a victim of abuse" but that she did "feel like [Foster Mother Claire] has told [the older boys] to say stuff" at the therapy sessions. McClain testified that the children want to see their Mother and they "seem very attached and very open." She testified that Mother's interactions appear appropriate, that she displays love and is very engaged, and that she is never late to sessions. McClaine testified that termination was not in the best interest of the children at this time.

13

When asked to describe some of the issues that needed to be addressed, McClain testified that there are allegations of sexual abuse that are being investigated, and that during one session Marcus had confronted Mother and said "you sexually abused [Matt]," which Mother denied. McClain testified that Mother presented fine parenting abilities during the sessions but that she was "very hesitant" to report about how Mother may be acting outside the sessions. McClain testified that the brothers had experienced past trauma, including witnessing domestic violence, and that can constitute neglect or abuse. When discussing a specific outcry, McClain testified that Matt had said he was taking a shower and Mother "touched his private area" inappropriately. In response to a question by the court, McClain described Foster Mother Claire as having "a lot of influence" on the two older brothers. After the witness finished testifying, the trial court and counsel discussed changing Foster Mother Claire as the placement for the older boys.

Trial resumed one month later on June 30, 2023. Hicks was recalled and testified that she had continued to have weekly sessions with the two younger brothers. She testified that since family therapy visits restarted, Lucas showed increased defiance and pushing boundaries, and that she had seen a regression in his behaviors. She testified that Dave's behavior had also changed since visits resumed, with him becoming more defiant in the playroom and pushing boundaries. She reiterated that the younger boys' regression stopped when the family visits with Mother stopped. On cross-examination, Hicks conceded that she does not know for sure whether the behavior changes are caused by something Mother has done or are caused by the changes in seeing and not seeing their mother.

Kim Keever, a forensic interviewer, testified that she interviewed Lucas on June 14, 2022, and that Lucas did not make an outcry of abuse or neglect in the interview. She

testified that she interviewed Dave the same day and that he also did not make an outcry of abuse or neglect in this interview. She noted that Dave said that he saw Matt touch Marcus's bottom, but he did not provide any further information on when or where it occurred.

Cheryl McCarty, another forensic interviewer, testified that Matt did make an outcry of abuse or neglect during his May 4, 2022 interview. He told her that Mother had put her hand in his butt and touched his penis in the bathtub. During an extended discussion, McCarty clarified that Matt had shown that the touching of his penis involved an "open hand back and forth, but not a closed hand." She reiterated that Matt said it happened "too much to count" and that he did not indicate anything was in Mother's hand. McCarty testified that Matt also told her that Mother did "inappropriate stuff" to Marcus, and McCarty relayed that Matt said that Mother had "her hand in [Marcus's] butt and he was screaming." She testified that Matt said he had been sleeping, he went into the bathroom and told Mother to stop, he got his brother and took him back to his room, and that there was duct tape on his brother's mouth.

McCarty testified that Marcus made an outcry of abuse or neglect during his forensic interview the same day. Specifically, McCarty testified that Marcus said his mother "touched his butt" while he was taking a bath and gestured with his finger "what I would describe as a back-and-forth poking motion." She testified that Marcus said he was screaming and he referenced his brother taking duct tape off of his mouth. McCarty testified that Marcus said this occurred at Mother's house and that Marcus said "it was in his bottom." When asked whether this was consistent with what Matt described, McCarty responded affirmatively "yes."

McCarty testified that she had a second forensic interview with Matt on June 15 and that during that interview Matt talked "about his mom touching his penis, and he also talks about his mom touching his butt." Comparing the two interviews, McCarty explained that Matt

15

talked about being touched on the penis in both interviews but only spoke about being touched on the butt in the second interview. McCarty testified that she had a second forensic interview with Marcus the same day and that Marcus again made an outcry of abuse or neglect. She testified that he "talks about his mom touching his butt, and then he talks about red stuff in his butt that she had to get out, and he also talks about duct tape on his mouth." She confirmed that Marcus spoke about his Mother penetrating his "butt hole" in both interviews. McCarty clarified that both boys were able to differentiate between a truth and a lie and were referring to Mother when they said "mother." When asked whether either child indicated they had seen anyone else do the same type of things, McCarty testified that during his second interview Matt said that he saw Father touching Mother inappropriately in the same way. McCarty testified that both Matt and Marcus "said no one has told them what to say." When asked whether it's possible that the boys could have just been getting a bath, she responded "yes, it's possible."

Atwood returned to the stand and testified that she had continued therapy sessions with Matt and Marcus since the last hearing. She testified that in April, Matt shared with her that Mother had put her hand on his butt and that Mother had been inappropriate with Marcus. When asked whether Matt has indicated he wants to be reunited with Mother, Atwood testified that there have been times that he has wanted to go home but also that he is "afraid that his mom will, in his words, do bad things," that he's scared, and that he would prefer to be adopted. Atwood testified that Matt's behavior has escalated, that he has a lot of outbursts, and that he struggles with respect for authority since he restarted visits with Mother. She confirmed that his behavior improves when he no longer sees Mother. Atwood testified that Marcus has not made any new statements about Mother but that his behavior has escalated in aggression and outbursts since visitation resumed. She reiterated her earlier testimony that she does not believe it is in the best

16

interest of Matt or Marcus for them to have continued contact with Mother. On cross-examination, Atwood testified that consistency is important for children, that consistency affects behavior, and that regularity in seeing their mother and then stopping visits "could affect their behavior." In response to whether she could definitively say the reason for the outbursts is based upon wrongdoing by Mother, Atwood replied "no, I cannot."

Erin Mendoza testified that she has been Mother's therapist since July 2021. She testified that they had worked on improving relationships, recognizing domestic violence warning signs, and nurturing parenting skills. She discussed the "significant achievement" that Mother had improved her relationship with her own mother. When asked whether Mother should have contact with her children, Mendoza testified that "[f]rom my information from seeing [Mother], yes," but she cautioned that whether it would be in the best interest of the children to continue family therapy would depend on the family therapist's recommendation.

Mendoza's testimony continued one month later on July 28, 2022, the fifth and final day of trial. She testified that Mother told her she had left the children with her boyfriend and denied that she had actually left the children with Father. She recalled that Mother has diagnoses for generalized anxiety disorder and post-traumatic stress disorder (PTSD), and she clarified that the PTSD stems from "abuse and neglected childhood, and then also domestic violence" from the relationship with Father. She testified that she and Mother had discussed that there were sexual abuse allegations but they had been ruled out. Mendoza conceded she did not have contact with the children during the current proceeding.

Foster Mother Joan, who previously acted as a foster mother for the children during a previous removal, testified that she had no issues with how Mother interacted with the children and that she never witnessed any "alarming behavior." She testified that the children

17

never acted inappropriately after the visits and that she never observed any sexual behaviors or actions from the boys. On cross-examination, she conceded that she had not seen the children since before their removal at the beginning of the current case.

Mother then returned to the stand. Regarding the forensic interviews where there was a discussion about one child's "bottom being red," Mother testified that she did not "a hundred percent remember" but explained that the children loved Takis (a spicy snack food), that the food irritates their stomach and causes "explosive diarrhea," and that she used butt cream to clear up the rash. She testified that the children use the bathtub "like a swimming pool," that she supervises the children, but that she had never been inappropriate with the children. Mother testified that she has not been dating, and she reiterated that her boyfriend at the beginning of the case and Father are "two very different people." She expressed fear of Father, that she misses her children, and that she still has rooms set up for the children. She asked the trial court not to terminate her parental rights, and she reiterated that she has done "nearly everything" she was ordered to do. She confirmed that she would be able to make arrangements for school and daycare if the children were returned to her. She also described her support system and stated that she has spoken with her store management and co-workers and that "they understand that things are going to change when my children come home."

Mother reiterated that she was "completely denying your sexual allegations," including denying putting duct tape on the boys' mouths and stating she did not "even own duct tape." When discussing testimony about the boys' statements regarding sexual abuse and testimony that the children do not want to return home, Mother testified that the trial court should believe her rather than the children. She admitted that the children "have witnessed some things happen to me," and when asked for clarification, she testified that the children had

18

witnessed "[t]heir father hurting me and doing things to me that aren't right." She stated that she intends to continue family therapy with the same therapist if the children are returned to her. Mother testified that she never heard her children use "big words" like "inappropriate" before residing with Foster Mother Claire.

Foster Mother Gloria testified that after family therapy restarted for the younger two children, Lucas regressed to wearing pull ups and would "urinate and defecate on himself multiple times a day," when before he had not worn any diapers or pull-ups since March 2021. She testified that Lucas also attempted to "open mouth" kiss her on two occasions, which she stopped. She testified that Lucas's potty-training improved after several weeks once family visits stopped, and now he's no longer on pull ups and only has an accident "once every couple weeks, but that's fairly typical for him." She also testified that there have been no other sexualized behaviors; she noted that the last sexualized behavior before these instances was on February 1, 2022, a few days after a family therapy session.

Foster Mother Gloria stated that Dave became very emotional after the visits and would have meltdowns that "would be over 45 minutes." She stated he would start biting himself again, banging his head "mostly on pillows," and was "unable to self-regulate and calm down." She testified that after the family therapy sessions ceased, Dave returned to only taking "about three to four minutes to calm down," and she indicated that he is able "to self-regulate much better." She explained that Lucas starts kindergarten soon, and if he is not fully potty-trained at that time, he would be placed in a special education classroom. When asked whether the children's behaviors consistently became negative after family therapy visits with Mother, Foster Mother Gloria responded "yes."

19

Foster Mother Kimberly testified that Matt and Marcus were placed with her at the end of May 2022. She testified that sometimes Matt's behavior escalates and he tries to "run," such as one instance at a grocery store, and that he was removed from one daycare because of "violence." When describing how the children react when seeing Mother at family therapy sessions, she said that "you can tell that they're glad to see her" but she said they were also "indifferent, I guess, in some ways," contrasting that the boys' reaction was not the excitement she'd see on other children in similar situations. She described a conversation with Matt in the car where he seemed "conflicted with what his desires are and why," and when she asked whether he would like to live with Mother, he responded that "Yeah, I think so. But I want to be adopted." Speaking of living with Mother, Matt continued that "I think it would be okay because she's promised that she wouldn't do those things anymore." Foster Mother Kimberly stated that Marcus is "much more emotional" in the days following the family therapy visits, and that Matt tends to have a "shorter fuse." She testified that the older boys do see their younger siblings on a regular basis, and she said she had no concerns about the boys interacting with each other.

After hearing closing arguments, the associate judge found that termination of Mother's parental rights was in the best interest of the children and was supported pursuant to the statutory grounds under subsections (D) and (E). *See* Tex. Fam. Code § 161.001(b)(1)(D) (endangering environment), (E) (endangering conduct). Mother requested de novo review on August 2, 2022. The de novo hearing was rescheduled several times before finally being held almost six months later on February 10, 2023.[3]

---

[3] In the interim, an order of termination consistent with the associate judge's ruling was signed on September 27, 2022.

Kalyn Noyes, the Department's conservatorship specialist, testified that the case had been transferred to her in April 2022. She summarized the history of the proceeding, and she confirmed that the Department had never been able to locate the "boyfriend" of Mother. Noyes testified that, based on the Department files, the Department also believed that Father was around the children after his rights had been terminated, separate from the June 2020 and October 2020 incidents. She expressed concern that Mother viewed the service plan as a "checklist," that the service plan was more than that and required showing "substantial behavioral change," and that Mother did not change her behavior. Noyes reviewed the sexual abuse outcries by the older children and their forensic examinations. She testified that the boys' multiple forensic interviews were consistent. She explained that family therapy sessions were attempted multiple times, and she described the negative behaviors exhibited by the children, including aggression, "sleep regression," and regression of potty training, that led to therapy being stopped. She also reiterated the sexualized behaviors exhibited by some of the children. She explained that the behaviors of the children returned to "[n]ormal for them" once therapy stopped.

Noyes testified that there was concern of coaching or alienation as to the older two children, and after the two children were moved to a new foster placement, Matt's behaviors changed but were still concerning. She confirmed that the two older children—Matt and Marcus—had knowledge of sexual things beyond their years. She testified that the children are currently placed in prospective adoptive placements and that adoption was in their best interest. When asked whether Mother could provide safe and suitable housing, Noyes mentioned that Mother "was couch surfing and living in her car." She testified that Mother identified her mother and sister as part of her support system but that Mother had told Noyes that "her support

21

system is not local." Noyes testified that Mother currently has an ankle monitor and cannot be within a specified distance of the older two children. She testified that the foster parents are able to provide safe, suitable, and appropriate housing for the children, and the children continue to have regular contact with each other. She testified that Lucas and Dave refer to their current placement as their "new forever home." She stated that the children's behavior has "been improving substantially" since they stopped having visits with Mother.

When asked about Father breaking into the home in October 2020, Noyes explained that the Department wouldn't consider it as him "breaking into the apartment when he was allowed to be there." Noyes confirmed that there was a protective order in place at the end of the first case, and when asked whether allowing Father around the children was a blatant disregard for court orders, Noyes responded "yes." She testified that she had no concerns about the children's current placements meeting their needs in the future, but she expressed concern about whether Mother could meet "basic needs." She testified that neither Matt nor Marcus has expressed a desire to go back to living with Mother.

Foster Mother Gloria then testified, reiterating how Dave would repeatedly state "I do not feel safe. No, thank you. I want to go home" before family therapy visits with Mother. She indicated that there is a possibility that Lucas has special needs. She reiterated that after visits with Mother, Lucas would have increased aggression and frustration, and that Dave had regressions in his potty training. She explained that the children's behavior improved after the visits ended. She explained that during the time when there were no visits, "[w]e saw the self-harming behavior stop and cease [and w]e saw the sexualized behaviors stop and cease." She testified that the boys were no longer placed with her but that she believed the current home for Lucas and Dave was safe and suitable and met their needs.

Mother testified that she is currently homeless and has been sleeping in her car or in people's spare rooms or on their couches. She testified that she is currently employed at a convenience store where she was rehired after a three month break and that she is not currently in a relationship. When asked why she did not present the boyfriend to the Department, she responded that "I didn't feel the need to have any sort of more involvement with somebody who just up and left, for whatever reason, my kids alone." She stated she does not know where the boyfriend now lives and that she "[l]iterally cut him off that day." She testified that Father did not have access "by choice" to the children after his rights were terminated, and she reiterated that Father broke into her home in October 2020. She stated that, during that incident, Father "kicked in the back door, put a couple of holes in the wall, and abused me in front of" Matt and Marcus. She testified that Father assaulted her but did not sexually assault her "that time." Mother responded "No. Yeah. No. I don't remember" when asked whether she had contact with Father after he broke into her home and assaulted her.

Mother identified her family, including her mother and sister, as part of her support system, but clarified that they live in the Houston area and she does not live with them "[d]ue to the legal situation." Mother conceded that there are current pending charges against her, with Matt and Marcus as the victims.[4] When asked why she does not yet have an apartment, she stated that she was waiting for the outcome of the termination case. Mother stated that she was requesting a monitored return to give her time to switch over medical needs and get the apartment prepared, that she had "no issue keeping their same therapist," and that she would be willing to reach out for assistance from local organizations. Mother testified that she is planning on moving into an apartment in the Houston area that is geographically close to her family

---

[4] She later testified that she had not been indicted on criminal charges.

23

members. Mother agreed she would keep open communication with the foster placements even after the children were returned to her care. Mother stated that her bond condition requires her to be 1,000 feet away from her two older children. When asked what her plan was for caring for Matt and Marcus if they were returned and the bond condition was still in place, she mentioned that the boys could go to her sister "if need be."

Foster Mother Claire returned to the stand to discuss the original foster placement for Matt and Marcus. She reiterated that the boys' behavior was "[f]or the worse" after visits but would change for the better once visits stopped. Foster Mother Claire testified that after the therapeutic visits stopped in January 2022, the boys were "very well-adapted at home but were having a lot of problems at school with behaviors still." She testified that the boys again had more behavior issues during the second round of therapeutic visits starting in April 2022. She described one instance with Marcus where he, after a visit, sat in her lap and "tried to grab [her] breast and kiss [her] sexually on the mouth." She testified that the older boys had knowledge of sexual things beyond their years, demonstrated by their actions, and that Marcus would sexually act out towards her after visits with Mother. However, she noted that the boys and Mother appeared to have affectionate, but appropriate, interactions when she observed them interacting in general settings.

Jane Bowen, the guardian ad litem, testified that CASA believes the best interest of the children is termination of Mother's parental rights. She expounded that Mother has "never been willing to be honest about the incident that brought the kids into care" and that she's not capable of caring for the children. She noted that the children made a lot of progress in foster care, but every "time we tried to start visits, they would regress and it would get worse again." Bowen testified that she did not believe Mother has the skills, resources, or support system to

24

manage the children. She testified that the younger two children are "happy in their forever home" and that the older two children said they want to be adopted. Bowen also identified the "huge positive change" for the older two children in their current foster placement. Under further questioning, Bowen testified that Mother had presented multiple plans, that she had one viable plan previously "when she was working and had the apartment with the two bedrooms," but that her more recent plans described during the de novo hearing were not viable. She testified that Mother did not have "a good relationship with her family throughout this case."

On March 9, 2023, the trial court signed an order on Mother's request for de novo hearing, affirming the July 28, 2022 decision by the associate judge and finding by clear and convincing evidence that subsections (D) and (E) supported termination and that terminating Mother's parental rights was in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (b)(2). This appeal followed.

## STANDARD OF REVIEW

To terminate the parent-child relationship, a court must find by clear and convincing evidence that (1) the parent has committed one of the enumerated statutory grounds for termination and (2) it is in the child's best interest to terminate the parent's rights. Tex. Fam. Code § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

In this context, "[t]he distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). When determining legal sufficiency, we consider whether "a

25

reasonable factfinder could form a firm belief or conviction that the finding was true" when the evidence is viewed in the light most favorable to the factfinder's determination and undisputed contrary evidence is considered. *Id.* at 631. When determining factual sufficiency, we consider whether "in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* We must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *see also In re P.A.C.*, 498 S.W.3d 210, 214 (Tex. App.— Houston [14th Dist.] 2016, pet. denied).

However, "an appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id.* "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.*

## DISCUSSION

In her first issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings under Subsections (D) and (E). In her second issue, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's best interest finding.

26

*Statutory Predicate Grounds*

Subsection (D) "focuses on the child's environment and may be utilized as a ground for termination when the parent has 'knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.'" *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (quoting Tex. Fam. Code § 161.001(b)(1)(D)). Subsection (E) focuses on a parent's conduct and "allows for termination of parental rights if clear and convincing evidence supports that the parent 'engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.'" *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam) (quoting Tex. Fam. Code § 161.001(b)(1)(E)).

The relevant inquiry under Subsection (D) is whether "the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being." *J.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00274-CV, 2021 WL 5225432, at *5 (Tex. App.—Austin Nov. 10, 2021, pet. denied) (mem. op.). "A single act or omission can support termination under subsection (D)." *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.). In contrast, the relevant inquiry under Subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act," *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied), and "must be based on more than a single act or omission," *C.B. v. Texas Dep't of Fam. & Protective Servs.*, 458 S.W.3d 576, 582 (Tex. App.—El Paso 2014, pet. denied).

For both the child's environment under Subsection (D) and the parent's conduct under Subsection (E), "endanger" means "to expose to loss or injury; to jeopardize." *In re J.W.*,

27

645 S.W.3d at 748 (quoting *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "'[E]ndanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, [but] it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Boyd*, 727 S.W.2d at 533); *see also A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied). "Because the evidence pertaining to subsections (D) and (E) is interrelated, we consolidate our review of the evidence." *J.M.*, 2021 WL 5225432, at *5.

As described above, Department representatives testified that the children were removed after they were found unattended at an apartment complex; that Mother testified she left the children with her "boyfriend," but the oldest child stated that Mother's boyfriend was actually Father; and that the Department believed Mother was still allowing Father around the children in violation of a protective order. The children were also moved to a new placement after October 2020 when Father "broke in[to]" paternal grandmother's house, committed domestic violence against Mother, and then took Mother's car. *See In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("Evidence of domestic violence may be considered as evidence of endangerment under subsection (E)."). Mother confirmed that the children had witnessed domestic violence by Father against Mother, but Mother repeatedly testified that she had no further contact with Father after the October 2020 incident and that she was afraid of Father. *See N.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00217-CV, 2019 WL 3952842, at *8 (Tex. App.—Austin Aug. 22, 2019, no pet.) (mem. op.) ("[E]vidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past." (quoting *Smith v. Texas Dep't of*

28

*Protective & Regul. Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.)). However, Sharp testified that there were approximately four previous intakes regarding domestic violence between Mother and Father over three or four years, and she expressed concern that Mother would continue "to stay in this pattern" of completing services and then continue to see Father and bring the children around him. *See C.B.*, 458 S.W.3d at 582 (explaining that endangering conduct must be "by the parent's actions" or "by the parent's omission or failure to act"). McManus further testified that the oldest child had told her that every time Father "gets out of jail, he shows up and then he comes back into care." *See In re J.E.M.M.*, 532 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("A child is endangered when the environment creates a potential for danger and the parent is aware of the danger but consciously disregards it."). Noyes similarly testified that the Department would not consider the October 2020 incident as Father "breaking into the apartment when he was allowed to be there." Further, the children (except the youngest who was not yet born) had previously been removed from Father's and Mother's custody in the past; Mother completed her services and obtained the return of her children, but Father's rights were terminated and the protective order against him was issued. However, Shabani and others testified that Mother still allowed Father around the children in the subsequent months. *See S.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00695-CV, 2022 WL 2542007, at *11 (Tex. App.—Austin July 8, 2022, pet. denied) (mem. op.) (considering repeated endangering conduct across multiple Department cases).

There was also evidence of sexual abuse by Mother. For example, McCarty testified about forensic interviews of both Matt and Marcus during which they made outcries of sexual abuse by Mother. McCarty noted that the brothers' separate interviews were consistent and that the boys were able to differentiate between telling the truth and lying. She also noted

29

that Matt's two forensic interviews were consistent that Mother had sexually touched Matt's penis, and Marcus's forensic interviews were consistent regarding Mother touching his butt. Noyes reiterated that the sexual abuse outcries interviews were consistent. *See In re E.A.R.*, 583 S.W.3d 898, 908 (Tex. App.—El Paso 2019, pet. denied) ("The child's environment refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home."). Mother denied the allegations, stated that she never harmed her children, and testified that earlier sexual abuse allegations had been investigated and "closed out" by the Department. But at the time of the de novo hearing, Mother was prohibited from being within 1,000 feet of either Matt or Marcus. *See In re C.J.P.*, No. 05-22-00233-CV, 2022 WL 7936574, at *13 (Tex. App.—Dallas Oct. 14, 2022, pet. denied) (mem. op.) (explaining that physical and sexual abuse by parent weighs in favor of terminating parental rights). Moreover, Warner previously testified about Mother's "inability or unwillingness to take responsibility for the reason why her children are in care, as well as her frequent denial or minimization of the issues that her kids are dealing with." The trial court as fact finder was the "sole arbiter" of Mother's credibility and was free to weigh Mother's testimony against the other testimony presented during trial. *See In re A.B.*, 437 S.W.3d at 503; *see also In re P.A.C.*, 498 S.W.3d at 214.

We conclude that this evidence is legally and factually sufficient to support the district court's finding that Mother knowingly placed or knowingly allowed the children to remain in conditions and surroundings which endangered their physical or emotional well-being and its finding that Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D)–(E). We overrule Mother's first issue.

30

*Best Interest Finding*

In her second issue, Mother challenges the legal and factual sufficiency of the evidence supporting the best interest finding. "[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). "In parental-termination proceedings, [the Department's] burden is not simply to prove that a parent should not have custody of [the] child; [the Department] must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with the child whatsoever." *S.B. v. Texas Dep't of Fam. & Protective Servs.*, 654 S.W.3d 246, 255 (Tex. App.—Austin 2022, pet. denied) (quoting *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.)).

We may consider nine factors to determine whether termination is in a child's best interest: the child's wishes, the child's emotional and physical needs now and in the future, any emotional or physical danger to the child now and in the future, the parenting abilities of any parties seeking access to the child, programs available to help those parties, plans for the child, the stability of any proposed placement, any evidence that the parent-child relationship is improper, and any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re A.C.*, 560 S.W.3d at 631; *S.B.*, 654 S.W.3d at 255. The party seeking termination has the burden of establishing that termination is in the child's best interest. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The set of factors is not exhaustive; although one factor is not necessarily dispositive, in some instances evidence of a single factor may suffice to support the best interest finding. *See Holley*, 544 S.W.2d at 371–72; *see also In re C.H.*, 89 S.W.3d at 27; *S.B.*, 654 S.W.3d at 255. Ultimately, the *Holley* factors focus on the child's best interest, not the parent's. *In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003,

31

no pet.). Evidence proving one or more statutory grounds for termination can be probative evidence that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 28.

We begin with the children's wishes. Although Mother testified that the children had expressed during family therapy sessions that they wanted to return home, Cavazos (the original family therapist) testified that the children did not express any desire about wanting to live with Mother. *See In re P.A.C.*, 498 S.W.3d at 214 (explaining that trier of fact is judge of witness's credibility and weight given to testimony). Furthermore, Bowen (the guardian ad litem) testified that the older two children stated that they wanted to be adopted, and Warner (the CASA volunteer) testified that all four children had individually expressed that they wanted to be adopted. At most, there was testimony showing that Matt, the oldest child, had indicated he had conflicting desires about returning to his Mother or being adopted. However, Atwood testified that Matt indicated that he was scared and "afraid that his mom will . . . do bad things" if he returned, and Foster Mother Kimberly testified that Matt qualified his desire to return by stating it would be okay "because she's promised that she wouldn't do those things anymore." *See* Tex. Fam. Code § 263.307(b)(5) (requiring consideration of "whether the child is fearful of living in or returning to the child's home").

When considering the children's physical and emotional needs, any emotional or physical dangers to the children now and in the future, and the potential placements for the children, "it is well settled that stability and permanence are paramount considerations in evaluating the needs of a child." *N.K. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00028-CV, 2022 WL 2673236, at *8 (Tex. App.—Austin July 12, 2022, no pet.) (mem. op.). The record is replete with testimonial evidence that the children exhibited worsening behavior, including physical aggression and sexually inappropriate behavior, whenever the children had

32

visitation with Mother and that the behavior improved once visits stopped. Sharp testified that there were approximately four previous intakes regarding domestic violence between Mother and Father, and she expressed concern that Mother continued "to stay in this pattern" of completing recommended services and then going "back to doing what she is not supposed to be doing." Shabani similarly testified that the issues in the present termination proceeding were also present in Mother's previous case. Moreover, Department caseworkers also testified about their concerns that Father was allowed around the children even after a protective order was entered after the previous case. *See J.G.*, 592 S.W.3d at 525 ("[A] trier of fact may measure a parent's future conduct by [her] past conduct and determine whether termination of parental rights is in the child's best interest." (quoting *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.))). Although Mother denied she allowed Father to see the children after his rights were terminated and testified that she had no contact with Father after his break-in in October 2020, Mother also admitted that the children had observed domestic violence between Mother and Father. *See In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied) (concluding evidence of "history of neglecting and endangering the children, of exposing them to domestic violence" weighs in favor of best interest finding).

Further, testimony indicated that Mother's "boyfriend" who she left the children with unattended was actually Father, that the Department could not locate the supposed boyfriend, and that Mother had no answer and "refused to discuss it further" when Warner told Mother that providing the boyfriend's information would "clear up" confusion. In response, Mother only testified that she did not know where the boyfriend now lives, that she had "[l]iterally cut him off that day," and that she "didn't feel the need to have any sort of more involvement with somebody who just up and left." *See E.F.-B. v. Texas Dep't of Fam. &*

33

*Protective Servs.*, No. 03-22-00443-CV, 2022 WL 17478423, at *4 (Tex. App.—Austin Dec. 7, 2022, no pet.) (mem. op.) ("[A] trial court is not bound to accept the truth or accuracy of a parent's testimony, either as to past actions or future intentions.").

Similarly, Mother testified during trial that she had maintained safe and stable housing for her children as well as legal employment. Mother also testified about her plans for placing the children in therapy, school, and daycare, as well as extracurricular activities. However, by the time of the de novo hearing, Mother was homeless, sleeping in her car or on her friends' couches or in their spare rooms. She testified that she was on a waiting list for an apartment but did not want to get the apartment before knowing whether the children were going to be returned. Mother also was prohibited from being within 1,000 feet of the two oldest children because of a bond condition relating to pending charges against her, and she therefore stated that her children could live with her sister while resolving those outstanding issues. Although Mother identified her family members as part of her support network, Bowen testified that Mother did not have "a good relationship with her family throughout the case." She further testified that Mother's plans described during the de novo hearing were not viable, and Warner previously expressed concern that Mother's previous plans for the children did not incorporate the particular needs of the individual children. In contrast, there was testimony that the children at the time of the de novo trial wanted to be adopted by their current placements, that the children had regular sibling contact, that the younger children referred to their placement as their "forever home," and that the children's needs were being met at the placements.

Finally, we consider evidence of behavior indicating that the parent-child relationship is improper and any excuses for said behavior. *Holley*, 544 S.W.2d at 371–72. As discussed above, there was extensive testimony that Mother had sexually abused at least her

older two children. That included McCarty testifying about multiple, consistent forensic interviews where Matt said that Mother did "inappropriate stuff" to him, and McCarthy testifying that Marcus said that Mother had touched his penis, as well as Marcus telling McCarty that Mother had touched his buttock during a bath and that Marcus had been screaming. Mother denied those allegations and noted that earlier sexual abuse allegations had been investigated and "closed out" by the Department, but by then Mother was facing pending charges and was prohibited from being within 1,000 feet of either Matt or Marcus. *See In re C.J.P.*, 2022 WL 7936574, at *13 (explaining that physical and sexual abuse by parent weighs in favor of terminating parental rights). Moreover, Warner previously testified about Mother's "inability or unwillingness to take responsibility for the reason why her children are in care, as well as her frequent denial or minimization of the issues that her kids are dealing with."

Reviewing the record under the appropriate standards of review and considering the relevant factors, we conclude that the trial court could have reasonably believed that termination was in the children's best interest. *See In re C.H.*, 89 S.W.3d at 27. Moreover, there is not any disputed evidence that is so significant as to prevent the district court from forming that firm conviction. *In re A.C.*, 560 S.W.3d at 630. We conclude that this evidence is legally and factually sufficient to support the district court's finding that termination of Mother's parental rights was in the best interest of the children. We overrule Mother's second issue.[5]

---

[5] Mother also argues that the trial court abused its discretion by appointing the Department as permanent managing conservator. *See* Tex. Fam. Code § 153.131(b). However, that section is inapplicable because it only creates "a statutory preference for placement with a parent while a parent still retains [his] parental rights." *T.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-14-00351-CV, 2014 WL 6845198, at *5 (Tex. App.—Austin Nov. 25, 2014, no pet.) (mem. op.). Mother, however, no longer enjoys any conservatorship presumption after her parental rights have been terminated. *See* Tex. Fam. Code § 101.024(a) (noting that for purposes of Family Code, "the term [parent] does not include a parent as to whom the parent-child

**CONCLUSION**

Having concluded there was sufficient evidence supporting the trial court's termination under subsection (D) and (E) and its best interest finding, we affirm the trial court's final decree terminating Mother's parental rights to the children.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed: August 11, 2023

---

relationship has been terminated"). Mother has failed to demonstrate her entitlement to appointment as managing conservator under Section 153.131. *See In re M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *21 (Tex. App.—Fort Worth June 28, 2021, pet. denied) (mem. op.) (concluding no abuse of discretion in appointing Department after termination of parent's parental rights). We overrule her final issue.